**Ray MARSHALL, etc.**

v.

**AETNA INSURANCE COMPANY.**

**Civ. A. No. 78–0079–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 26, 1978.

Marshall H. Harris, Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa., Eliot Norman, Asst. U. S. Atty., Richmond, Va., for plaintiff.

J. Patrick McElliogott, Jr., J. Robert Brame, III, McGuire, Woods & Battle, Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

The Secretary of Labor brought this action pursuant to 29 U.S.C. § 217, part of the Fair Labor Standards Act, to enjoin defendant Aetna Insurance Company from violating the equal pay provision of the Act, 29 U.S.C. § 206(d), and to restrain the defendant from withholding back wages, together with interest thereon, to the extent found

by the Court to be due defendant's employee Nellie Barratt. Defendant is an insurance corporation located within the jurisdiction of this Court and is an enterprise within the meaning of 29 U.S.C. § 203(r), the definitions section of the Fair Labor Standards Act.

After a full trial on the merits, the Court took the case under advisement. Plaintiff and defendant have filed briefs and the case is presently before the Court for a decision on the merits.

Mrs. Barratt, James W. Garrett, and Christopher W. Archer were, during the time relevant to this case, commercial casualty underwriters for Aetna in its Richmond regional office. Mrs. Barratt and Mr. Garrett worked together as commercial casualty underwriters from 19 March 1973, when Mr. Garrett was hired, until January 1976 when Mr. Garrett was fired. Mrs. Barratt and Mr. Archer worked together from 2 February 1976 when Mr. Archer was hired, until 24 January 1977 when he was promoted to the position of training coordinator. Adjustments have been made to Mrs. Barratt's salary by the defendant so that any differential that existed between her salary and Mr. Garrett's has been eliminated. The question at hand is whether the lower salary paid to Mrs. Barratt as opposed to Mr. Archer is a violation of the equal pay provision of the Fair Labor Standards Act or whether there is legally recognizable justification for Mrs. Barratt's lower salary.

Mrs. Barratt was initially hired by Aetna in its Richmond regional office on 12 January 1970 as a Grade 11 commercial casualty underwriter at an annual salary of $7,000. On 4 January 1971 her salary was raised to $7,600. On 3 January 1972 her salary was raised to $8,800. On 9 April 1973 her salary was raised to $9,500 and her classification changed to Grade 12. On 8 April 1974 her salary was raised to $10,500. On 5 August 1974 her salary was raised to $10,950. On 24 March 1975 her salary was raised to $11,900. On 5 April 1976 her salary was raised to $13,000. At that time her prior compensation was retroactively adjusted to be on a par with what Mr. Garrett had been

making. On 9 September 1976 her salary was raised to $13,200. On 4 April 1977 her salary was raised to $14,200. On 3 April 1978 her salary was raised to $16,700 and Mrs. Barratt was promoted to Senior Casualty Underwriter, Grade 13.

Mrs. Barratt has extensive experience in the insurance industry. In 1957–58 she was an accounting clerk with the Maryland Casualty Company. From January 1963 to March 1964 she was a casualty underwriter with the Hanover Insurance Group in Detroit, Michigan. From April 1965 to January 1966 she was with the Peck Insurance Agency in Detroit. From January 1966 through October 1967 she was an underwriter with the Royal Globe Insurance Company in Detroit and from January 1968 to October 1969 she was a motor vehicle underwriter with the Home Insurance Company in Detroit.

Mr. Garrett also had extensive experience in the insurance industry and after being hired on 19 March 1973 by Aetna at a salary of $11,000, he received a raise on 8 April 1974 to $11,800. He received another raise on 5 August 1974 which brought his salary to $12,250 per year and on 24 March 1975 his salary was increased to $13,200 per year. As Mrs. Barratt's salary has been retroactively adjusted to reflect these raises to Mr. Garrett, there is no present issue as to any differential between Mr. Garrett and Mrs. Barratt. Mr. Garrett was fired, as above noted, in January 1976. The reason given was poor work performance though his technical ability was not questioned.

Upon Mr. Garrett's termination, Aetna hired Christopher W. Archer as a commercial casualty underwriter, Grade 12, at an annual salary of $14,700. On 24 January 1977 he was promoted to the position of training coordinator at a salary of $16,300. At the time of his hiring by Aetna Mr. Archer had been employed as a casualty underwriting supervisor for United States Fidelity and Guarantee Corp., where he had been working for approximately five years. Aetna recognized United States Fidelity and Guarantee Corp. as a leader in the casualty underwriting field and particularly

wanted to obtain the services of an underwriter whose experience had been gained with that company. Previously, Mr. Archer had been an underwriter for three years with the Fireman's Fund Company.

Mr. Archer and Mrs. Barratt were both working as commercial casualty underwriters in the Richmond regional office of Aetna from 2 February 1976 until 24 January 1977 when Mr. Archer was promoted. During that time Mr. Archer's salary was consistently higher than Mrs. Barratt's salary even taking into account the retroactive salary adjustments by Aetna. The issue before the Court is whether that salary discrepancy is a violation of the equal pay provisions of the Fair Labor Standards Act.

The job of a commercial casualty underwriter entails the servicing of a group of independent insurance agents who are in regular contact with different insurance companies as these agents offer to place policies for their clients with one of the insurance companies. The business of placing policies is competitive both in terms of price and in terms of service provided to the insurance agencies by the insurance companies.

Agencies are assigned to underwriters at Aetna's Richmond office largely on a geographical basis. The Richmond office is responsible for Virginia, Maryland and the District of Columbia. The insurance agent usually initiates contact with the underwriter assigned to his territory by sending the insurance company a completed form requesting a rate quotation for a certain amount of insurance covering a specific casualty risk. Sometimes the agent will contact the underwriter informally to request advice concerning the company's position on certain risks. When the offer is received the underwriter must evaluate the risk and either accept, reject or modify it within the company's underwriting guidelines and within the underwriter's limits of authority.

The guidelines used by Aetna's commercial casualty underwriters are printed in Aetna's "Commercial Casualty Underwriting Guide." This is a fundamental tool for the underwriter because it states the Company's underwriting philosophy and the Company's position on various commercial casualty risks.

The limits of authority which an underwriter has are specific written delegations of authority which authorize him to bind the Company to cover a particular type of risk up to a stated dollar amount of exposure. The limits of authority also allow the underwriter to modify premium payments up to a stated deviation based on the experience of the policyholder. The general underwriting guidelines and the individual underwriter's limits of authority are reviewed and revised periodically. Should a proposed risk exceed the underwriter's limits of authority, the underwriter must consult the underwriting supervisor who holds higher limits of authority. When, on occasion, a very large account will exceed even the supervisor's limits, then the Aetna home office in Hartford, Connecticut, must be consulted before the risk is insured.

Along with accepting, rejecting, or modifying a particular risk, the underwriter must also process the paperwork involved in the insurance policy, including obtaining rate quotations and preparing the physical insurance policy itself. A policy often requires modifications, known as endorsements, which are processed by the underwriter in the same manner and are subject to the same limits of authority as the original policy.

As the date for expiration of a policy approaches, the underwriter contacts the agent involved to arrange for a renewal, which is also handled in the same way as a new policy. The underwriter is also responsible for requiring inspection of risks, which is performed by an agency hired for that purpose. These inspections may cause modifications in the terms of a policy.

At Aetna, commercial casualty underwriters handle the following types of policies: general liability, workmen's compensation, crime and glass, commercial automobile, and excess coverage which is known in the trade as "commercial umbrella." These umbrella policies, written to insure for losses in excess of the normal limits of cover-

age, are usually sold in multiples of one million dollars.

National accounts are handled in a somewhat different manner than the usual account handled by the commercial underwriters in Aetna's Richmond office. National accounts are those having a premium in excess of $150,000 per year. These accounts represent the largest possible risks that the company will agree to insure. Thus, extreme care must be taken in evaluating the risks. Furthermore, the size of the premium represents a significant source of income to Aetna. Decisions concerning national accounts are, in the main, made by the home office with the underwriter in Richmond performing minimal servicing of the accounts.

Certain types of policies may present difficulties due to the type or scheduling of premium payments. Retrospective rating policies offer other complexities because the policy holder ends up paying for losses retroactively if the rate quoted by the underwriter is low or high in light of the subsequent experience of the insured. In performing all these varied functions, the underwriter must continually work with the insurance agents so that new business and renewals are obtained while at the same time preserving the integrity of the Company.

When Mrs. Barratt and Mr. Garrett worked side by side as commercial casualty underwriters, each performed the duties noted above, spending approximately the same amount of time on each of the duties. After Mr. Garrett was fired, his functions and duties were transferred to the incoming commercial casualty underwriter, Christopher W. Archer. Mr. Archer was assigned to Garrett's desk and was assigned essentially to service Garrett's book of agents. From 2 February 1976 to 24 January 1977, when Archer was promoted, Barratt and Archer performed the duties described above.

When Archer and Barratt worked side by side, Barratt serviced more national accounts and handled some more difficult risks than did Archer. On the other hand, Archer handled some risks more thoroughly and more profitably than Barratt. He was especially adept at handling collateral and related matters which Barratt did not ordinarily concern herself with despite frequent requests by her supervisors.

When Barratt and Garrett were employed together their limits of authority were identical in all respects, including size of risk, hazard rating of risk, type of risk assumed, umbrella authorization, and deviation from standard liability rates. When Archer took Garrett's place, he stepped into the same limits of authority which had been held by Garrett. Sometimes Barratt received higher limits of authority than either Garrett or Archer because when J. Evan Rees, the commercial casualty supervisor, was away from the office, he delegated his higher limits of authority in writing to Barratt.

From 9 February 1976 to 31 August 1976 the Richmond area office of the Wage & Hour Division, U. S. Department of Labor, conducted an investigation into sex discrimination in pay practices at Aetna's Richmond office. During the course of that investigation defendant decided unilaterally to raise the wages of three female employees, including Mrs. Barratt, in an attempt to be certain that their wages were in compliance with the provisions of the Equal Pay Act. This was done in September 1976 and the three employees received back wages. This was when Mrs. Barratt's salary was retroactively raised so as to make it coincide with Mr. Garrett's.

■ For purposes of the Equal Pay Act, equal work means "substantially equal" and not "identical." Minor or insubstantial differences in the jobs will not cause work performed by males and females to be unequal. *Corning Glass Works v. Brennan*, 417 U.S. 188, 203, n. 24, 94 S.Ct. 2223, 2232, n. 24, 41 L.Ed.2d 1 (1974); *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 290 (4th Cir. 1974); *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 493–4 (4th Cir. 1972).

■ The Secretary of Labor has the burden of proving a prima facie case of sex-based pay discrimination. Once this prima facie case is established, the burden shifts to the defendants to show that any wage differential is justified by one of the four exceptions found in 29 U.S.C. § 206(d)(1). *Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. at 2229; *Shultz v. First Victoria National Bank*, 420 F.2d 648, 654, n. 8 (5th Cir. 1969).

■ Plaintiff's prima facie case of sex discrimination is established by the proof that the work performed by female Barratt was substantially equal to that performed by male Archer, that their respective duties required substantially equal skill, effort and responsibility, that they worked under similar working conditions, and that male Archer was paid a higher salary than female Barratt. *Corning Glass Works; Fairmont Supply Co.* Although the statutory standard of the Equal Pay provision of the Fair Labor Standards Act does not call for identity of job functions, it appears that in this case Barratt and Archer performed exactly the same jobs in terms of effort and responsibility and that they worked side by side in the same office.

The four statutory exceptions which will serve to rebut a prima facie case as listed in 29 U.S.C. § 206(d)(1) are: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. Defendant in this case seeks to rebut the prima facie case by proof that the salaries of Barratt and Archer were each determined by reference to a bona fide merit system. In the case of Barratt the merit system measured her performance on the job and set her salary accordingly. In the case of Archer, a new hire, the merit system measured his value to the Company by means of evaluating his job application information and his responses to a number of interviews by supervisory personnel.

The decision to hire Archer and the level at which his salary was set was the result of his interviews at Aetna's Richmond office and an interview at Aetna's home office in Hartford. In Richmond Mr. Archer was subjected to structured interviews by three persons, Mrs. Jeanne McFarland, the underwriting manager, Michael Katos, the administrative manager of the Richmond office, and Evan Rees, the commercial casualty underwriting supervisor. Thereupon the decision to hire and the salary grade level was set by agreement among the supervisors.

Since Aetna's defense is that Archer was paid more than Barratt due to a merit system as permitted in the Equal Pay Act, it is equally as important to understand how Barratt's pay was arrived at.

Aetna's merit system for persons already employed, *e. g.*, Mrs. Barratt, consists of annual performance evaluations of employees by supervisory personnel. The evaluations attempt to measure the performance of individual employees against the planned goals and objectives of the Company. Prior to Mr. Archer's hiring in February of 1976, Mrs. Barratt had been evaluated on five separate occasions. Mr. Archer, a new hire, perforce was not evaluated by the evaluation procedure used to evaluate an old hire, Mrs. Barratt, until almost a year after his hiring.

As noted above, the merit system for new employees consists of interviews and a determination of the proper grade and salary based on the interviews and on the application information. The decision to hire Archer and the level at which his salary was set was the result of the interviews noted above. The criteria used to evaluate Archer are reflected on the interview evaluation forms. These forms seek and require information which a decision maker needs in determining a reasonable and proper grade and salary for a new employee. Subjective determinations necessarily play a substantial part in the management decision as to the appropriate grade and salary for the new employee.

Due to its subjectivity, there is no guarantee that the interview process used by Aetna for new employees is applied even-handedly as regards to sex. There can be

no assurance that each interviewer understands and applies the standard in exactly the same way. Because of the necessity of subjective judgment the hiring of a casualty underwriter may be subject to conscious or unconscious sex bias.

In light of the above, it is apparent that Mr. Archer's salary was not set by the same merit system that was used to measure Mrs. Barratt's performance during her tenure with Aetna. Mr. Archer's salary was set as a result of a new hire evaluation while Mrs. Barratt's was set by an old hire evaluation.

In deciding what grade and salary should be paid to Mr. Archer, Aetna took into account its management's expectation that he would be able to handle larger and more complex risks than Mrs. Barratt had shown herself capable of. Management recognized in Mr. Archer potential for promotion to a supervisory or management position. As a matter of fact on 24 January 1977 Mr. Archer was promoted to the position of training coordinator and on 12 December 1977 he was promoted to administrative manager.

Mr. Archer's college education of four years, but without taking a degree, was not a factor in Aetna's decision to pay him $14,700 a year. In his application for employment Mr. Archer had requested a salary of $14,700.

■ The exceptions listed in the statute are to be narrowly construed against the employer asserting them. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1047 (5th Cir. 1973); *Hodgson v. Colonnades, Inc.*, 472 F.2d 42, 47 (5th Cir. 1973).

■ To fit into one of the above exceptions, the exception must be rationally and systematically applied to members of both sexes on an equal basis. This is but an obvious corollary to the principle that the Equal Pay Act was meant to eliminate the practice of relegating women to financially inferior positions in the working world.

*Corning Glass Works; Behrens Drug Co.; Schultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir. 1970), *cert. den.*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

■ The burden that shifted to Aetna is analogous to the burden that an employer bears in rebutting a prima facie Title VII case; "merely that of proving that he based his employment decision on a legitimate consideration." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 968 (1978). *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 727 (5th Cir. 1970); *Wheaton Glass Co.*, 421 F.2d at 266. In other words, Aetna must show that its decision on pay fit into one of the four legitimate exceptions specified in the Act.

■ The evidence before the Court shows that the difference between Mrs. Barratt's salary and Mr. Archer's starting salary was not determined on the basis of sex but was based upon Aetna's reasonable expectation that Mr. Archer's ability and more substantial prior underwriting and managerial experience would allow him to take on greater responsibility and would make him a more valuable employee.

■ The evidence establishes that Aetna has employed a written merit review plan for its employees. Periodic evaluations of Mrs. Barratt's performance resulted in the continual raises which she received. This merit review system of Aetna's qualifies as a merit system within the meaning of § 6(d)(1)(ii) of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1)(ii). *Brennan v. Federal National Mortgage Assoc.*, 11 Empl. Prac.Dec. § 10,898 (1976), *aff'd sub nom. Dunlop v. Federal National Mortgage Assoc.*, 566 F.2d 1181 (1977). The merit review system, of necessity, involves judgments by people and is thus to that extent subjective. But it clearly bears a reasonable and rational relationship to the defendant's need of obtaining and retaining a competent staff of casualty underwriters.

■ This merit review system was implemented by a woman, Barbara Klingel, and female employees of the company, including the Richmond office's female underwriting manager, participated and con-

curred in Archer's prehiring interviews and evaluation and decision to pay him a starting salary of $14,700. Likewise, these female employees participated and concurred in the evaluation which determined Barratt's salary. The involvement of women in these decisions is of some weight albeit not conclusive or even particularly strong, that Aetna's merit system is not discriminating on the basis of sex. The personnel decisions here, as noted above, are, of necessity, matters of judgment and the Court will not substitute its judgment for those charged with making these decisions where the decisions are not made on the basis of any impermissible factor. *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, n. 14 (1st Cir. 1978); *Green v. Board of Regents*, 335 F.Supp. 249, 250 (N.D.Tex. 1971), aff'd 474 F.2d 594 (5th Cir. 1973).

The Court has explained the duties of a casualty underwriter for Aetna in great detail to show the importance of an underwriter's decisionmaking ability to an insurance company. "By his or her decisionmaking, the underwriter helps determine the economic viability of his company, an entrepreneurship function." *Cupples v. Transport Insurance Co.*, 371 F.Supp. 146, 147 (N.D.Tex.1974), *aff'd*, 498 F.2d 1091 (5th Cir. 1974). We are dealing here with the type of decisionmaking position that is substantially removed from a routine skilled or non-skilled job. This is not the case where one person can perform a routine task as well as another. The economic lifeblood of the company depends upon how underwriters do their jobs. Thus, while the subjective criteria used in evaluating employees in the merit review plan might be looked upon with suspicion by the Court if the evaluation were of employees performing routine work, such subjectivity is absolutely necessary here. *Sweeney; Green.*

The plaintiff claims that Aetna could not properly subject Mrs. Barratt to performance evaluations while not checking with United States Fidelity & Guarantee to find out how Mr. Archer's performance had been. But the difficulty and impracticability of requiring Aetna to check with a previous employer for whom the prospective applicant is still working is obvious to the Court. Requiring Aetna to check with United States Fidelity & Guarantee about Mr. Archer's past performance would only insure that an employee of another firm would not apply for a job with Aetna lest he be injured in his present position for looking around and, if not hired by Aetna, might be out of a job.

The merit review plan under which Mrs. Barratt was evaluated was the plan used for evaluation of all employees already working for Aetna. The merit plan under which Mr. Archer was brought to the company was the plan used to determine the salary of all new employees. This is not a case of one merit plan being used to evaluate female employees and the other one for male employees. It is the result of one plan for new employees and one plan for those presently employed. Nothing in the evidence even suggests that had only the sex of Mr. Archer and Mrs. Barratt been reversed, Mrs. Barratt would not be making the salary enjoyed by Mr. Archer.

The Court thus concludes that the difference in pay between Mr. Archer and Mrs. Barratt is the result of a bona fide merit system, one of the exceptions specifically allowed by 29 U.S.C. § 206(d)(1).

For the foregoing reasons, judgment will be rendered for the defendant.