[No. 52154-9.   En Banc.   July 3, 1986.]

SUSAN ADAMS, ET AL, *Appellants,* v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

SHEILA SCOTT, *Appellant,* v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

*Peterson, Bracelin, Young, Putra & Fletcher, Inc., P.S.,*
by *Kelby D. Fletcher,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Elsa
Kircher Cole, Assistant,* for respondent.

DURHAM, J.—Susan Adams, Candice Barker, Rita Wall,
and Elisa Matriz brought an action against the University
of Washington alleging that the University had violated
RCW 49.12.175 by paying them less money in wages and
benefits than it provided for men doing similar work in the
composing room of the University's Department of Print-
ing. This action and a later identical action brought by
Sheila Scott were consolidated for trial. The trial court
found no violation of RCW 49.12.175 and dismissed all
claims. Adams, Barker, Wall, Matriz, and Scott appealed.
We affirm.

Appellants are past or present employees of the compos-
ing room in the University's Department of Printing. Until
1978, only journeyperson compositors were employed in the

composing room. All received identical wages. In March of that year, there were 16 men and 3 women journeypersons.

Over the last 30 years, the printing industry has changed greatly due to advances in technology. Processes have become automated and computerized and the tasks performed by journeypersons have become obsolete or used less frequently. Journeypersons formerly were required to properly assemble, space, and position hot metal type by hand. Composing of printed materials became automated, at first by a process which involved keyboarding a machine–readable tape. Modern equipment now produces correctly spaced and positioned type by command directly from a computer keyboard.

Because of these technological changes in the industry, nonunion shops began to attain a competitive advantage because they were able to print for substantially lower costs. In an attempt to remain competitive and to preserve the journeyperson classification, the International Typographical Union Local 99 entered into a supplemental collective bargaining agreement in March 1978 with some printing plants in the Seattle area. The agreement allowed two new categories of union employees, computer typists and paste makeup assistants, to be hired at wages less than those paid to journeypersons.[1] These new categories of employees were to have job duties of keyboarding printed material and preparing camera–ready copy from positive material. The supplemental agreement prohibited replacing journeypersons with the new categories of employees.

The University is not, and by law cannot be, a signatory to the union contract. Its Department of Printing has, however, followed the typographical union contract's salary and wage provisions for over 30 years. The University agreed to implement the new employee classifications in order to be economically competitive. The Department of Printing has been losing money since 1977. The University

---

[1] These two categories of employees are sometimes referred to as two–thirders to reflect their rate of pay compared to that of journeypersons.

maintained its journeypersons, both male and female, at journeyperson wages. A number of reasons for this action were advanced in testimony at trial and adopted by the trial court in its findings.

First, some journeypersons have been needed to perform journey–level skills as required during the gradual phase–in of new equipment. Some of those skills are occasionally used today, although they represent only a fraction of the work performed in the composing room. Second, "[t]he University also wished to mitigate the impact of a potentially demoralizing adjustment in job duties and to lessen the adverse impact on the male and female journeypersons in the reassignment in their job functions." Finding of fact 2.23. Third, the University wished to avoid a potential confrontation with the unions.

Adams was hired as a paste makeup assistant on November 26, 1979, and terminated on November 13, 1980. Barker was hired as a paste makeup assistant on August 22, 1979 and was terminated on January 31, 1981. Elisa Matriz was hired on August 6, 1979 as a paste makeup assistant and continues in that position. Rita Wall was hired as a paste makeup assistant on May 24, 1978 and continues in that position. At various times during the period that these appellants were employed by the Department of Printing, two men and seven women were also employed as paste makeup assistants. All paste makeup assistants received equal wages, but less than those received by journeypersons.

Scott was hired as a computer typist by the University on October 9, 1979 and terminated on May 4, 1981. Various times during Scott's employment, two men and six women were also employed as computer typists. The computer typists also received equal wages, which were less than those received by journeypersons.

At times after March 1978, certain male and female journeyperson compositors performed work substantially similar to that performed by appellants and other paste makeup assistants and computer typists, both male and

female, in the composing room.[2]

The University had discontinued hiring any individuals as journeypersons since its decision to adhere to the supplemental agreement after March 1978. The number of journeypersons has decreased since then from 19 to 8 due to natural attrition. The last female journeyperson voluntarily left the composing room in 1983. Five of the eight remaining journeyperson compositors continue to perform journey–level work. The remaining three perform work substantially similar to that performed by computer typists and paste makeup assistants. These three journeypersons perform journey–level work on occasion although that work has decreased substantially.

In August 1980 Adams, Barker, Wall and Matriz grieved certain job assignments and their failure to be paid equally for equal work. The grievance was resolved in their favor by an arbitrator in April 1981—they were found to have performed certain journey–level tasks outside of their job classification and received awards of back pay at journeyperson rates. They then brought this action in 1981 against the University alleging that it has violated RCW 49.12.175 by paying them less money in wages and benefits than it provided for men doing similar work in the composing room. In 1982, Scott brought a separate but identical action against the University. By order of the court, the two cases were consolidated into the present action in 1983.

Prior to trial, all parties stipulated that Scott's counsel would not take an active role at trial but that Scott would be bound by the court's determination of liability. In addition, the University voluntarily stipulated that at times after March 1978, certain of the journeyperson compositors, both male and female, performed work substantially similar to that performed by the appellants and other male and female paste makeup assistants and computer typists in the composing room.

The case was tried without a jury in October 1983. The

---

[2]The parties stipulated to this in advance of trial.

trial judge found no violation of law and dismissed the claims of all appellants. Appellants moved for reconsideration, which was denied. Findings of fact, conclusions of law and the court's order were filed on December 6, 1983.

We are asked to interpret, for the first time,[3] the State's equal pay statute, RCW 49.12.175 enacted in 1943. The section reads as follows:

> Any employer in this state, employing both males and females, who shall discriminate in any way in the payment of wages as between sexes or who shall pay any female a less wage, be it time or piece work, or salary, than is being paid to males similarly employed, or in any employment formerly performed by males, shall be guilty of a misdemeanor. If any female employee shall receive less compensation because of being discriminated against on account of her sex, and in violation of this section, she shall be entitled to recover in a civil action the full amount of compensation that she would have received had she not been discriminated against. In such action, however, the employer shall be credited with any compensation which has been paid to her upon account. A differential in wages between employees based in good faith on a factor or factors other than sex shall not constitute discrimination within the meaning of RCW 49.12-.010 through 49.12.180.

Both parties agree that RCW 49.12.175 is virtually identical to the federal Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) (1982) and urge this court to examine federal court interpretations of the federal act.[4] In *Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 125, 615 P.2d 1279 (1980), a wage discrimination case brought on the basis of sex under RCW 49.60, the court looked to interpretations of sections of the federal Civil Rights Act of

---

[3]Although this court has not interpreted the statute, a decision from the Court of Appeals commented on it in a footnote. *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 55 n.7, 573 P.2d 389 (1978).

[4]For a scholarly treatment of the Equal Pay Act, see C. Sullivan, M. Zimmer & R. Richards, *Federal Statutory Law of Employment Discrimination* 585–701 (1980). Also, *see generally* the cases collected in Annot., 7 A.L.R. Fed. 707 (1971 & Supp. 1985).

1964. *See also Albertson's, Inc. v. State Human Rights Comm'n*, 14 Wn. App. 697, 699, 544 P.2d 98, 87 A.L.R.3d 87 (1976). The legislative history of RCW 49.12.175 does not provide any guidance for interpreting the state provision.

The federal Equal Pay Act is "broadly remedial". *Corning Glass Works v. Brennan*, 417 U.S. 188, 208, 41 L. Ed. 2d 1, 94 S. Ct. 2223 (1974). The congressional purpose in enacting it was to remedy serious and endemic employment discrimination in private industry. By requiring the payment of equal wages for equal work, Congress prohibited wage structures based on the "ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" *Corning Glass*, at 195 (quoting S. Rep. 176, 88th Cong., 1st Sess. 1 (1963)).

In a federal Equal Pay Act case, the plaintiff has the burden of proving that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions". 29 U.S.C. § 206(d)(1) (1982).[5] *Corning Glass Works v. Brennan, supra.* The federal act may impose a heavier burden than the state act due to its threshold requirement of "equal" work compared with the state act's threshold requirement of "similar" work. In any event, appellants have met their burden in this case

---

[5]The full text reads:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1) (1982).

through the stipulation that journeypersons being paid higher wages than the appellants at times performed substantially similar work.

When the plaintiff has met the burden of showing different pay for equal work, the burden shifts to the employer to show that the differential is allowed under one of the federal Equal Pay Act's four exceptions. *Corning Glass,* at 196–97. The burden of proving this affirmative defense is a "heavy one". *Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1029 (6th Cir. 1983), *cert. denied,* 465 U.S. 1025 (1984).

The federal act's four exceptions allow different pay for equal work pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex".[6] 29 U.S.C. § 206(d)(1) (1982). The Washington statute, RCW 49.12.175, contains only one exception which provides: "A differential in wages between employees based in good faith on a factor or factors other than sex shall not constitute discrimination". This, both parties concede, is essentially the same exception as the

---

[6]During House debate, Representative Griffin commented on the meaning of this fourth exception:

> [R]oman numeral iv . . . makes clear and explicitly states that a differential based on any factor or factors other than sex would not violate this legislation. In other words, even though jobs involve the same skill, equal effort, equal responsibility, and are performed under the same working conditions, if there is any other factor not based on sex upon which a differential is based, then no violation of this law can be found. Roman numeral iv is a broad principle, and those preceding it are really examples . . .

109 Cong. Rec. 9203 (1963). *See also* 109 Cong. Rec. 9198 (1963) (remarks of Rep. Thompson); *Id.* 9206 (remarks of Rep. Goodell).

*Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1030 (6th Cir. 1983), *cert. denied,* 465 U.S. 1025 (1984).

*Marshall v. Aetna Ins. Co.,* 487 F. Supp. 717, 724 (E.D. Va. 1978) held that exceptions to the Equal Pay Act are to be narrowly construed against the employer asserting them. However, most of the authorities cited in *Marshall* for that proposition are Supreme Court and Fifth Circuit cases interpreting other provisions of the Fair Labor Standards Act before adoption of the Equal Pay Act amendments in 1963. The *Marshall* holding seems to conflict with the legislative history quoted.

fourth exception in the federal Equal Pay Act.

Regulations have been adopted by the United States Department of Labor interpreting the Equal Pay Act and providing examples of permitted exceptions based on factors other than sex. 29 C.F.R. § 800.140–.151 (1966). These regulations are entitled to great deference. *Hein v. Oregon College of Educ.*, 718 F.2d 910, 914 n.3 (9th Cir. 1983).

Particularly at issue in this case is the principle in 29 C.F.R. § 800.146 (1966) allowing an exception for "red circle" wage rates, which are described in the regulation as "certain unusual, higher than normal, wage rates which are maintained for many reasons." An example is given as a situation where a long–term male employee who can no longer perform his regular work for health reasons is transferred to different work which is now being performed by women. Under the red circle principle, the male employee may continue to receive a salary greater than that paid to women for doing the same work.

A Congress committee report on an Equal Pay Act precursor (H.R. 6060, 88th Cong., 1st Sess. (1963)) described the origin of the term "red circle rates":

> This term is borrowed from War Labor Board parlance and describes certain unusual, higher than normal wage rates which are maintained for many valid reasons. For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs.

H.R. Rep. 309, 88th Cong., 1st Sess. 3, *reprinted in* 1963 U.S. Code Cong. & Ad. News 687, 689, *quoted in Bence v. Detroit Health Corp., supra* at 1029–30.

Appellants contend that the red circle exception does not contemplate a permanent and wholesale change in job functions, as in this case, to allow higher wages to be permanently paid to men for doing the same work done by women in another job category. They rely on the provision following the red circle regulation. Section 800.147 explains

that an exception for temporary reassignments of employees to perform work in different job classifications is permitted. According to the temporary reassignment regulation, an employee may continue to receive the higher rate paid for the work which he ordinarily performs. The converse situation is also allowed where a lower–paid employee is temporarily assigned to perform work normally compensated at a higher rate.

The regulation states, "Generally, failure to pay the higher rate for a period longer than one month will raise questions as to whether the reassignment was in fact intended to be a temporary one." A recent case in the Eleventh Circuit, however, found that a male employee's wages were properly red circled where he performed work substantially identical to that of a lower–paid female counterpart for over 2 years. *Gosa v. Bryce Hosp.*, 780 F.2d 917, 919 (11th Cir. 1986).

Appellants argue that temporary reassignments are examples of the red circle principle. However, examination of the regulations reveals that both red circle rates and temporary reassignments are given as examples which illustrate the application of factors other than sex. The red circle principle is not limited to the temporary reassignment principle which follows it in the regulations.

The regulations themselves begin by discussing the exceptions permitted by the Equal Pay Act and noting the placement of the respective burdens of proof on plaintiff and defendant as discussed earlier. 29 C.F.R. § 800.140–.141 (1966). The regulations also discuss the central principle that sex must not be a factor in excepted wage differentials and the means of establishing that it is not a factor. They briefly discuss the types of "systems" excepted by the act and the general application of exceptions. 29 C.F.R. § 800.142–.145 (1966). The next six subsections are titled as examples of the application of exceptions. The first example is the red circle principle discussed above, § 800.146. The second is temporary reassignments, § 800.147. The third example allows employees in training programs to

perform equal work with nontrainees of the opposite sex without violating the equal pay principle, § 800.148. The fourth example disallows wage differentials based on "head of household" status, § 800.149. The fifth example generally allows wage differentials for temporary and part–time employees, at least for periods of employment shorter than 1 month or work weeks of 20 hours or less, § 800.150. The last example disallows wage differentials based on differing costs of employing women workers as a group versus employing men as a group, § 800.151.

Appellants do not cite authority for their argument that the red circle principle applies only to temporary reassignments. The University cites several cases wherein it contends federal courts have upheld unequal pay scales for reasons similar to those that the University has advanced in this case.

In *Maxwell v. Tucson,* 34 Empl. Prac. Dec. (CCH) ¶ 34,518, *appeal dismissed,* 749 F.2d 37, 35 Empl. Prac. Dec. (CCH) ¶ 34,795 (9th Cir. 1984), an employer was allowed to pay a male predecessor and a female employee at different rates where the male's position was downgraded to effect cutbacks and cost savings. The *Maxwell* opinion was, however, withdrawn by the Court of Appeals when it was discovered that it did not have jurisdiction to hear the appeal because the plaintiff's Title 7 claims had not been decided by the District Court. *Maxwell,* 35 Empl. Prac. Dec. (CCH) ¶ 34,795. The appeal was dismissed and remanded to the District Court.

After a reorganization, employees in *Mangiapane v. Adams,* 19 Empl. Prac. Dec. (CCH) ¶ 9,030 (D.D.C. 1979) were paid at different rates for performing the same work. The different wage scales were upheld because the higher and lower grade classifications contained both men and women.

Recognition of a male employee's long–term service by paying him higher wages than a female employee performing a substantially equal job function was upheld in *Salazar v. Marathon Oil Co.,* 502 F. Supp. 631 (S.D. Tex. 1980).

The court in *EEOC v. Samedan Oil Corp.*, 29 Empl. Prac. Dec. (CCH) ¶ 32,901 (E.D. Okla. 1982) upheld the retention of higher wages following forced transfers and demotions to lower paying positions.

Appellants distinguish the above cases as mostly dealing with single employees being adversely affected. *Maxwell v. Tucson, supra; Salazar v. Marathon Oil Co., supra.* They also claim that male–female ratios were more equal than in this case or that transfers were between existing job categories instead of newly created job categories. *EEOC v. Samedan Oil Corp., supra.* Their position is that red circle wages may only be paid for temporary periods.

The Department of Labor regulations do not contain as an example the factual situation present in this case. However, the principle established by the Equal Pay Act and discussed at length in those regulations is that the exceptions were intended to allow different rates "based on any other factor other than sex". The types of factors permitted by the federal courts—reorganization, recognition of long–term service, and forced transfer and demotion—are analogous to the situation in the composing room of the University printing plant.[7] The fourth exception to the Equal Pay Act, allowing differences based on any factor other than sex, was intended by Congress to be a broad principle. *See County of Washington, Or. v. Gunther,* 452 U.S. 161, 170 n.11, 68 L. Ed. 2d 751, 101 S. Ct. 2242 (1981); *see also Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 877 (9th Cir. 1982) (fourth exception is "broad general exception", citing legislative history).

██ The Ninth Circuit has adopted a "business reason" test in applying the exception.

The Equal Pay Act entrusts employers, not judges, with making the often uncertain decision of how to accomplish

---

[7]One of the reasons advanced by the University was the desire to avoid conflict with the unions. Adherence to a collective bargaining agreement, by itself, is not a "factor other than sex" or a valid defense to a federal Equal Pay Act claim. *Brennan v. Board of Educ.,* 374 F. Supp. 817, 830, 832 (D.N.J. 1974); *accord, Dunlop v. Beloit College,* 411 F. Supp. 398, 401 (W.D. Wis. 1976).

business objectives. *See County of Washington v. Gunther*, 452 U.S. at 170–71 . . . A pragmatic standard, which protects against abuse yet accommodates employer discretion, is that the employer must use the factor reasonably in light of the employer's stated purpose as well as its other practices.

*Kouba*, at 876–77; *cf. Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589, 594 (3d Cir.) ("economic benefits" to an employer are a legitimate business reason justifying a wage differential), *cert. denied*, 414 U.S. 866 (1973).[8] We concur in the reasoning of the Ninth Circuit and hold that a legitimate business reason is a "factor . . . other than sex" within the meaning of RCW 49.12.175 as well.

The University has articulated legitimate business reasons for its actions and reasonably and consistently applied them. The trial court recognized the University's business reasons for its actions in the following detailed findings of fact:

2.13 The University of Washington has followed the salary and wage provisions of the typographical union contract in order to attract and maintain the most qualified compositors in its composing room and because the terms of the contract have been deemed fair by the University of Washington administration.

2.14 Since at least 1954 great technological advances were made in the printing industry. As the industry became modernized and computerized, the need for trained journeypersons to handle hot metal type decreased substantially. Composing of printed materials could be done by keyboarding a tape to be read into a machine, rather than by manual operation of a typesetting machine, and later by commands direct from computers. Modern photocomposing equipment could produce paper type already correctly spaced and positioned without requiring the skillful assembly of metal type with proper spacing and positioning to be lifted without bottom support from a makeup stone.

---

[8]*Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1030–31 (6th Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984) contains a useful discussion of the tests employed by *Kouba v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir. 1982) and *Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3d Cir.), *cert. denied*, 414 U.S. 866 (1973).

2.15 With the technological changes many of the tasks performed by journeypersons in the University of Washington and in other printing operations began to become obsolete or were required less frequently.

2.16 Non–union shops in Seattle and the Seattle area were able to produce printed material at a cost substantially less than that done at the University of Washington and elsewhere because of these technological advancements.

. . .

2.18 The University of Washington attempts to cover its costs in the Department of Printing by the rate charged out to customers.

2.19 The University of Washington's Department of Printing has been losing money since 1977. The University of Washington charges customers of its printing plant for editorial services rendered by its department of communication. That surcharge is about 11 percent of total print costs. Some other union plants do not make such similar charges.

. . .

2.23 Although not a signatory to the supplemental agreement, the University of Washington agreed to implement the new classifications to be economically competitive. The University decided to maintain its journeypersons, male and female, at journeyperson wages in order to retain the skilled journeypersons it had for the times that journey–level skills were needed during the gradual phase–in of new equipment. The University also wished to mitigate the impact of a potentially demoralizing adjustment in job duties and to lessen the adverse impact on the male and female journeypersons in the reassignment in their job functions. The University benefited from that decision in that it avoided a potential confrontation with the union and it avoided having skilled journeypersons leave the department.

2.24 If the University had paid computer–typists and paste makeup assistants at journeyperson wages, the cost per hour of doing work in the composing room would have been higher resulting in higher charges to customers.

2.25 The University determined in March 1978 that it would no longer hire any individuals as journeyperson compositors after March 1978, but through natural attri-

tion, due to retirements, transfers, and deaths, it would phase out the job classification of journeyperson compositor.

■ The trial court's findings are supported by substantial evidence in the record and should not be disturbed. *Nichols Hills Bank v. McCool*, 104 Wn.2d 78, 82, 701 P.2d 1114 (1985).

In this case, a class of predominantly male employees qualified to perform largely obsolete skills was paid higher wages than a class of predominantly female employees to perform substantially similar work. The University, however, premised its action in good faith on the legitimate business reasons cited above, which reasonably explain the disparity and qualify as "a factor or factors other than sex". RCW 49.12.175. We conclude that the state equal pay statute was not violated.

Appellants next argue that the University's payment of journeyperson wages for much of the work done in the composing room is an unconstitutional gift of state funds, citing Const. art. 8, § 5.[9] Their arguments turn upon the lack of economic justification for the payment of journeyperson wages to perform work requiring lower skills. The authority mainly relied upon by the appellants is *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965). In that case, the State challenged the Port's use of funds for promotional hosting. There were no agreements binding the hosted parties to conduct any business with the Port of Seattle. This court held that the use of port funds for such a purpose was without consideration and thus unconstitutional because Const. art. 8, § 7 prohibits municipal corporations from giving or loaning any money or credit. The fact that the funds were expended for a public purpose in *O'Connell* or that a loss of business would result from discontinuing the practice did not make it constitutional. *O'Connell*, at 804–06.

---

[9]"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." Const. art. 8, § 5.

A gift of state funds is within the prohibition of Const. art 8, § 5 against lending the State's credit. Such an unconstitutional gift of state funds is a decrease in the state general fund and a gratuitous benefit to a recipient. *State Hwy. Comm'n v. Pacific Northwest Bell Tel. Co.*, 59 Wn.2d 216, 224, 367 P.2d 605 (1961); *cf. General Tel. Co. v. Bothell*, 105 Wn.2d 579, 587–88, 716 P.2d 879 (1986) ("a gift is a transfer of property without consideration and with donative intent") (interpreting Const. art. 8, § 7). The key factor is lack of consideration.

Any act or forbearance which has been bargained for is consideration sufficient to support a promise. *Huberdeau v. Desmarais*, 79 Wn.2d 432, 439–40, 486 P.2d 1074 (1971). In this case, the journeypersons were retained at their previous salary to perform journey–level skills which were still occasionally needed. They occasionally perform journey–level work, but mostly they perform the same type of work as appellants. Regardless of whether the journeypersons are performing work requiring a higher or a lower skill level, the University does receive consideration for the wages it pays them.

■ Unless there is proof of donative intent or a grossly inadequate return, courts do not inquire into the adequacy of consideration. *Scott Paper Co. v. Anacortes*, 90 Wn.2d 19, 32–33, 578 P.2d 1292 (1978); *Washington Natural Gas Co. v. PUD 1*, 77 Wn.2d 94, 101–04, 459 P.2d 633 (1969) (both cases interpreting Const. art. 8, § 7). If this court were to examine the adequacy of wages paid to state employees, it would intrude upon the freedom of contract, establish a burdensome precedent for future court calendars, and go beyond its proper function. *See Power v. Barry Cy., Mich.*, 539 F. Supp. 721 (W.D. Mich. 1982); *Gerlach v. Michigan Bell Tel. Co.*, 501 F. Supp. 1300, 1320–21 (E.D. Mich. 1980) (both cases holding comparable worth claims not authorized by Equal Pay Act or Title 7). In sum, the payment of journeyperson wages to state employees for performing work substantially similar to that performed by lower–paid employees is not an unconstitutional gift of

state funds in violation of Const. art. 8, § 5.

The trial court's decision dismissing all of the appellant's claims is affirmed. The University's preservation of the journeyperson classification awaiting the natural attrition of its members was based on factors other than sex and is not prohibited by RCW 49.12.175.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.