# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RANDOLPH PETERSON, a taxpayer resident, | ) ) ) | No. 79090-1-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, a state agency; PORT OF BENTON, a Washington port district, | ) ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) ) ) | FILED: June 17, 2019 |

MANN, A.C.J. — Randolph Peterson sued the Port of Benton (Port) alleging that the Port violated article VIII, section 7 and article I, section 12 of the Washington Constitution by allowing Burlington Northern Santa Fe Railway Co. (BNSF) the free use of public railroad tracks despite the wear and tear caused by BNSF's use of those tracks. Peterson appeals the trial court's order granting summary judgment and dismissing his case. We affirm.

I.

In 1947, the Atomic Energy Commission (AEC), and the predecessors to BNSF and the Union Pacific Railroad (UP) entered into a contract to establish rail service to

the Hanford Nuclear Reservation (Hanford).[1]  The 1947 contract provided that the predecessors of BNSF and UP would each pay one half of $100,000 to AEC, which equaled the cost to construct 5.4 miles of rail tracks between Hanford and the north bank of the Yakima River.  In return, BNSF and UP would be entitled to use those tracks free of rental or any other charge.  The 1947 contract was terminable upon six months' notice.  The Interstate Commerce Commission (ICC) approved the 1947 contract and included in its report that "when full payment has been made, [BNSF and UP] should thereafter be permitted to operate over the tracks without further payments."[2]

In 1998, the Department of Energy (DOE) declared certain parts of its Hanford property to be surplus, and transferred 767.13 acres of industrial property to the Port by indenture.  The conveyance was valued at $5.1 million.[3]  The conveyance included the 5.4 miles of railroad tracks built under the 1947 contract.  The indenture assigned DOE's rights under the 1947 contract to the Port.  As assignee, the Port agreed to be bound by the obligations and considerations in the 1947 contract.[4]  The successor to the ICC, the Surface Transportation Board (STB), approved the transfer.

The same day that the indenture became effective, the Port entered into a maintenance and operation agreement with Livingston Rebuild Center, Inc. (LRC), where the Port paid LRC to maintain the track.  Peterson controlled LRC.

---

[1] The parties to the original 1947 contract were the AEC, Northern Pacific Railway Company, the Oregon-Washington Railroad & Navigation Company, and its lessee the Union Pacific Railroad Company.

[2] A second agreement was entered between the railroads and AEC in 1961 addressing use of certain spur tracks.  The 1961 agreement was converted to a permit in 1979.  The 1961 agreement and 1979 permit did not change the relevant terms of the 1947 contract.

[3] The property today is valued in excess of $50 million dollars.

[4] The Port also agreed to be bound by the terms of the 1961 agreement and 1979 permit.

Subsequently, Peterson formed the Tri-City Railroad Co. (TCRY) as a local, short-haul railroad company, and LRC assigned its rights and obligations under the maintenance agreement to TCRY.

In 2000, the Port entered an agreement with TCRY to interchange railroad cars. Under the interchange agreement, TCRY charged BNSF a per-car fee for exchanging cars for the benefit of BNSF's customers. The interchange agreement "specifically reserved BNSF's rights under the 1947 and 1961 Agreements."

In 2002, TCRY negotiated a lease agreement with the Port for the right to operate the track and use certain real and personal property. The lease obligated TCRY to "use the Property for the operation and maintenance of railroad transportation facilities." The lease was "subject to the restrictions contained in the Indenture between the United States of America and the Port, the amendments thereto, and the Quit Claim Deed from the United States of America." The lease also obligated TCRY's "use, operations, and maintenance of the tracks [to] comply with the provisions of the Quit Claim Deed and Indenture from the United States of America through which the Port acquired title to the property." Additionally, the lease indicated that TCRY was provided with copies of the indenture.

The lease indicated that TCRY, "at its sole cost and expense, shall maintain the Property and all improvements and fixtures then existing thereon in good condition and repair, subject to reasonable wear and tear." Until 2009, BNSF paid TCRY to interchange cars, on a per-car basis. The interchange fees were used to maintain the tracks. BNSF provided TCRY with a written termination notice because BNSF realized

it "could operate its own cars on the Richland Trackage at a savings of around $100-150 per car" under the 1947 contract.

When BNSF ended its agreement with TCRY in 2009, TCRY did not believe that BNSF had a right to operate directly on the tracks and attempted to physically block BNSF's use of the tracks. BNSF responded by filing a lawsuit in the United States District Court seeking declaratory and injunctive relief prohibiting TCRY from blocking BNSF's access to the rail tracks. BNSF Ry. Co. v. Tri-City & Olympia Ry. Co. LLC, 835 F. Supp. 2d 1056, 1066 (E.D. Wash. 2011). The District Court declared that "for all of the historical complexity surrounding the Richland Trackage, the relative rights of the parties are actually quite simple: The United States granted BNSF and UP's predecessors in interest full rights to operate on the Richland Trackage, and TCRY took possession of the Richland Trackage subject to these rights." BNSF Ry. Co., 835 F. Supp. 2d at 1066-67. The District Court entered a permanent injunction requiring TCRY to allow BNSF and UP to directly serve customers on the tracks. BNSF Ry. Co., 835 F. Supp. 2d at 1066.[5]

Peterson filed this action on August 15, 2016, alleging the Port and the Washington Department of Revenue (DOR) violated their statutory taxing duties, article VIII, section 7, and article I, section 12 of the Washington Constitution. BNSF and UP successfully moved to intervene. Port taxpayers, Peggi Doggett, Jennifer Hartsfield, Jason Mount, Mandi Oukrop, and James Summey then successfully moved to intervene, objecting to the Port's gift of public funds and property to BNSF.

---

[5] Currently BNSF and UP operate as Class I carriers, providing competitive interstate service to businesses in the Port.

All parties moved for summary judgment. The trial court granted the Port's and BNSF's motions for summary judgment and denied Peterson's motion for summary judgment. Peterson appeals.

II.

Peterson argues first that by allowing BNSF to use its tracks rent free, and without paying for the impact to the tracks from wear and tear, the Port has made an unconstitutional gift of public funds in violation of article VIII, section 7 of the Washington Constitution. Peterson contends that the trial court erred when it found that there was no issue of material fact as to whether the Port was receiving a grossly inadequate return. We disagree.

We review summary judgment de novo and consider the facts in a light most favorable to the nonmoving party. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Elcon Const., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). "In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact." Young, 112 Wn.2d at 225. If the moving party is the defendant and meets this initial showing, "then the inquiry shifts to the party with the burden of proof at trial." Young, 112 Wn.2d at 225. Constitutional issues are reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

A.

Article VIII, section 7 of the Washington Constitution provides:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

The purpose of this constitutional provision is "to prevent state funds from being used to benefit private interests where the public interest is not primarily served." Japan Line, Ltd. v. McCaffree, 88 Wn.2d 93, 98, 558 P.2d 211 (1977).

To determine whether there has been a gift of state funds, courts apply a two-pronged analysis:

> First, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held not to serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of appropriating body in order to determine whether or not a gift has occurred.

CLEAN v. State, 130 Wn.2d 782, 797-98, 928 P.2d 1054 (1996). The court's analysis focuses on consideration and donative intent. City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn.2d 679, 702, 743 P.2d 793 (1987). To overcome the presumption that the indenture is constitutionally valid, Peterson must show that BNSF's use of the railway amounts to a "transfer of property without consideration and with donative intent." General Tel. Co. v. City of Bothell, 105 Wn.2d 579, 588, 716, P.2d 879 (1986); City of Tacoma, 108 Wn.2d at 702.

B.

The parties do not dispute that the answer to the first prong of the CLEAN analysis—whether BNSF's use of the tracks rent free carries out a fundamental governmental purpose—is no. The focus thus turns to whether there was a donative intent and consideration. CLEAN, 130 Wn.2d at 797-98. "We use the donative intent element to determine how closely we scrutinize the sufficiency of the consideration, 'the key factor.'" City of Tacoma, 108 Wn.2d at 703 (quoting Adams v. Univ. of Washington, 106 Wn.2d 312, 327, 722 P.2d 74 (1986). "Absent a showing of donative intent or gross inadequacy, trial courts should only apply a legal sufficiency, under which a bargained-for act or forbearance is considered sufficient consideration." City of Tacoma, 108 Wn.2d at 703; King County v. Taxpayers of King County, 133 Wn.2d 584, 601, 949 P.2d 1260 (1997).

1.

Peterson argues that the Port had express donative intent when it allowed BNSF to use the railroad tracks rent free. Donative intent can be determined as a matter of law. King County, 133 Wn.2d at 597-601. Peterson makes several arguments in support of his contention that the Port had express donative intent.

Peterson first argues that the Port's donative intent is evident because it has never terminated BNSF's revocable permit, the Port allows no other tenant to use its public property rent free, and no other government entity in Washington allows BNSF to use publicly-owned tracks without monetary compensation. This evidence is not sufficient to show that the Port had donative intent when it began allowing BNSF to use the rail tracks rent free. To the contrary, under the indenture, the Port received property

valued in 1998 at $5.1 million in exchange for agreeing to honor BNSF's operating rights under the 1947 contract.

Peterson next argues that the Port's donative intent is evident because UP continued to pay for its use of the railroad until 2017 while BNSF did not. Peterson contends that the Port required UP to begin paying monetary consideration in 2000, threatening to terminate UP's permit to use the tracks, while treating BNSF differently. It is unclear why UP continued to pay for its use of the track until 2017. However, UP's continued payment until 2017 does not demonstrate that the Port had donative intent when it allowed BNSF to continue to use the tracks rent free. Terminating BNSF's and UP's rights would leave the businesses the Port serves without Class I rail service.

Finally, Peterson argues donative intent is demonstrated because the Port hid BNSF's rent free use of the tracks from the State Auditor. Peterson argues that the Port was audited in 2012 and 2015 and never disclosed that BNSF was using Port property without paying monetary consideration or leasehold tax. Peterson fails, however, to offer a legal basis for why the Port was required to do so, where BNSF does not have a lease with the Port and thus does not pay leasehold taxes.

Peterson has failed to demonstrate express donative intent.

2.

Peterson next argues that, even if the Port did not have express donative intent, donative intent can also be demonstrated by the presence of grossly inadequate consideration. In general, we agree. See King County, 133 Wn.2d at 601 ("In the absence of donative intent or grossly inadequate return, the Court's review is limited to the legal sufficiency of the consideration for the lease."); City of Tacoma, 108 Wn.2d at

703. We disagree, however, with Peterson's position that this inquiry provides the court with an avenue to engage in "careful consideration of the 'consideration' received by the Port for the use of its tracks by BNSF." Peterson offers no legal support for such a detailed inquiry. To the contrary, in King County, our Supreme Court, over a vigorous dissent, made clear that reviewing courts "do not inquire into the adequacy of consideration, but employ a legal sufficiency test." 133 Wn.2d at 597. As the Court explained,

> [w]e have been reluctant to engage in an in-depth analysis of the adequacy of consideration because such an analysis interferes unduly with governmental power to contract and would establish a "burdensome precedent" of judicial interference with government decision making.

King County, 133 Wn.2d at 597. Adopting Peterson's call for a careful inquiry into the consideration as part of our analysis of the donative intent element would result in the same judicial interference that King County cautioned against.

Instead, while a grossly inadequate return may be relevant to the donative intent inquiry, we conclude that our review for gross inadequacy is similar to the general equitable contract law principal under which courts may set aside a contract where the consideration is "so gross as to shock the conscience," and thus may suggest fraud or other wrongdoing. See Miebach v. Colasurdo, 102 Wn.2d 170, 178, 685 P.2d 1074 (1984); Binder v. Binder, 50 Wn.2d 142, 150, 309 P.2d 1050 (1957). Peterson, does not argue, nor is there any evidence to support, that the consideration for the 1947 contract and the indenture was unconscionable. Cf. King County, 133 Wn.2d at 599-601 (rejecting the Taxpayers' argument that the Mariners' lease was "unconscionable" because the "consideration for the lease . . . is so grossly inadequate").

-9-

Instead, the Port bargained for nearly 768 acres of land, worth $5.1 million dollars in 1998, in exchange for assuming the obligations of the federal government in the 1947 contract. The Port has over 250 leases generating income. While it is clear from the indenture that the Port may terminate BNSF's and UP's rights to use the track on a six-month notice, doing so would leave the Port without any Class I railroads. "An incidental benefit to a private individual or organization will not invalidate an otherwise valid public transaction." King County, 133 Wn.2d at 596. The benefits to BNSF are incidental to acquiring $5.1 million in property and having two Class I railroads competing. The consideration for the contract and indenture was not grossly inadequate.

C.

Peterson also fails to demonstrate that the 1947 contract and indenture were not supported by legally sufficient consideration. King County, 133 Wn.2d at 597. Legal sufficiency "is concerned not with comparative value but with that which will support a promise." King County, 133 Wn.2d at 597 (quoting Browning v. Johnson, 70 Wn.2d 145, 147, 422 P.2d 591 (1967). The adequacy of consideration is a question of law and may be determined by a court on summary judgment. King County, 133 Wn.2d at 597.

The 1947 contract was supported by legally sufficient consideration. The 1947 contract provided that the predecessors of BNSF and UP would each pay one half of $100,000 to the AEC, which equaled the cost to construct 5.4 miles of rail tracks between Hanford and the north bank of the Yakima River. In return, BNSF and UP would be entitled to use those tracks free of rental or any other charge. Similarly, the

indenture was supported by legally sufficient consideration. The Port received nearly 768 acres of land, worth $5.1 million dollars in 1998, in exchange for assuming the obligations of the federal government in the 1947 contract.

Summary judgment and dismissal of Peterson's claims under article VIII, section 7, was appropriate.

### III.

Peterson next contends that the indenture violates the anti-favoritism provision of the privileges and immunities clause of the Washington Constitution. Because Peterson fails to identify any law that grants an unconstitutional privilege or immunity, and does not allege that this dispute implicates a fundamental right of state citizenship, we disagree.

Article I, section 12 of the Washington Constitution provides, "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." We analyze claims brought under article I, section 12 using a two-step analysis. Ockletree v. Franciscan Health Sys., 179 Wn.2d 769, 776, 317 P.3d 1009 (2014). First, we determine if the law in question involves a privilege or immunity, and second, if so, whether the legislature had a "reasonable ground" for granting the privilege or immunity. Ockletree, 179 Wn.2d at 776.

### A.

As a threshold matter, the plain language of article I, section 12 applies to the passing of a "law." Peterson's claim is based on the 1947 contract and the indenture. Both are contracts, not laws and thus, on its face article I, section 12 is not applicable.

-11-

Peterson argues, however, that the Port's resolution allowing it to enter the indenture has the force of law.

RCW 53.12.245 indicates that "[a]ll proceedings of the port commission shall be by motion or resolution recorded in a book or books kept for such purpose, which shall be public records." However, RCW 53.08.070 provides that "a port district may enter into any contract for warfage, dockage, warehousing, or port or terminal charges, with the United States or any government agency thereof . . . under such terms as the commission may, in its discretion, negotiate." While the Port adopted a resolution to enter the indenture with the DOE, RCW 53.08.070 authorizes the Port to negotiate the contract, in its discretion. Thus—while resolutions may have the force of law when operating as a general law—here, the resolution allowed the Port to enter a private contract with DOE, which cannot be challenged as a "law" under article I, section 12. Peterson does not cite any authority where an appellant successfully challenged a government contract as violating the privileges and immunities clause.

B.

Moreover, even if the resolution approving the indenture can be characterized as a law, and therefore subject to article I, section 12 analysis, Peterson's argument fails because he has failed to identify a fundamental right at issue.

"The privileges and immunities clause is concerned both with avoiding favoritism and preventing discrimination." Am. Legion Post #149 v. Wash. State Dep't. of Health, 164 Wn.2d 570, 606, 192 P.3d 306 (2008). But, "[a] privilege is not necessarily created every time a statute allows a particular group to do or obtain something." Am. Legion Post #149, 164 Wn.2d at 606-07 (citation omitted). "Privileges and immunities 'pertain

-12-

alone to those fundamental rights which belong to the citizens of this state by reason of such citizenship.'" Grant County Fire Protection Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 812-13, 83 P.3d 419 (2004) (quoting State v. Vance, 29 Wn. 435, 458, 70 P. 34 (1902) (emphasis added).

Peterson argues that the "government's obligation to be properly compensated for use of public property" is the fundamental right at issue. He cites Grant County and Ockletree in support. Peterson asserts that Grant County stands for the proposition that "the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from" is a fundamental right. Grant County, 150 Wn.2d at 813. But Peterson does not argue that BNSF's treatment is a result of its citizenship in another state. Similarly, Peterson cites Ockletree for the proposition that an exemption in Washington's Law Against Discrimination for religious groups implicated a fundamental right. But Peterson fails to explain how Ockletree is analogous or relevant to this dispute.

Peterson failed to identify a law and a fundamental right belonging to the citizens of this state to which the privilege and immunities and clause applies. Summary judgment and dismissal of his claim under article I, section 12 of the Washington Constitution was appropriate.

No. 79090-1-I/14

We affirm.

_____ Mann, A.C.J.

WE CONCUR:

_____  _____
Smith, J.                          Appelwick, C.J.

-14-