# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE_____ FEB 0 6 2014

_____
CHIEF JUSTICE

This opinion was filed for record
at _8:00 a.m.___ on _Feb 6, 2014_

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON | ) ) ) ) ) | No. 88218-5 |
| IN | ) ) | En Banc |
| LARRY C. OCKLETREE, individually, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FRANCISCAN HEALTH SYSTEM, a Washington Corporation, d/b/a ST. JOSEPH HOSPITAL, and JOHN and JANE DOE(S) 1-10, | ) ) ) ) ) | |
| Defendants. | ) ) | Filed __FEB 0 6 2014__ |

C. JOHNSON, J.—The certified questions in this case ask us to decide whether, the exemption of nonprofit religious organizations from the definition of "employer" under Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, violates article I, section 11 or article I, section 12 of the Washington Constitution. Larry Ockletree brought suit in state court against Franciscan Health System (FHS), challenging the termination of his employment following a stroke. Ockletree, who is African-American, claimed that his termination was the result of

illegal discrimination on the basis of race and disability. FHS removed the suit to federal court and moved to dismiss Ockletree's claims. FHS argued that it was exempt from WLAD as a nonprofit religious organization. Ockletree challenged the validity of the religious employer exemption under the state and federal constitutions. The district court certified questions to this court asking whether the religious employer exemption violates Washington's article I, section 11 establishment clause or its article I, section 12 privileges and immunities clause. We answer both questions in the negative.

### CERTIFIED QUESTIONS

1. The Washington Law Against Discrimination excludes religious non-profit organizations from its definition of "employer" (Wash. Rev. Code § 49.60.040(11)). Such entities are therefore facially exempt from WLAD's prohibition of discrimination in the workplace. Does this exemption violate Wash. Const. Article I, §11 or §12?
2. If not, is Wash. Rev. Code § 49.60.040(11)'s exemption unconstitutional as applied to an employee claiming that the religious non-profit organization discriminated against him for reasons wholly unrelated to any religious purpose, practice, or activity?

Order Certifying Question to the Wash. Supreme Ct. (Certification) at 4.

### FACTS

Plaintiff Larry C. Ockletree was employed as a security guard by FHS in 2010. He staffed a desk in the emergency department at St. Joseph Hospital, where

he checked visitors' identification and issued name tags. While employed by FHS, Ockletree suffered a stroke that impaired his nondominant arm. FHS determined he could not perform the essential functions of his job with or without accommodation, refused his requested accommodation, and terminated his employment.

Ockletree brought multiple causes of action in state court, including employment discrimination on the basis of race and disability in violation of federal law and WLAD. FHS removed the case to federal court and moved to dismiss four of Ockletree's claims, including his WLAD claim. Jurisdiction for Ockletree's federal employment discrimination claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, depends upon whether he timely exhausted administrative remedies. The filing period in question depends upon whether he has a valid state law discrimination claim. If Ockletree's WLAD claim fails, his federal claim is time barred.

FHS asserts that as a nonprofit religious organization, it is exempt from WLAD's definition of "employer" and therefore exempt from WLAD's private cause of action. RCW 49.60.040(11); Certification at 2-3. Ockletree challenges the exemption's validity under the state and federal constitutions. The United States District Court certified questions to this court asking whether the religious

employer exemption violates article I, section 11 or article I, section 12 of the Washington Constitution.[1]

ANALYSIS

The certified questions ask us to determine the constitutionality of the exemption of religious nonprofit organizations from WLAD.[2] WLAD was enacted in 1949 with the purpose of ending discrimination by employers "on the basis of race, creed, color, or national origin." *Griffin v. Eller*, 130 Wn.2d 58, 63, 922 P.2d 788 (1996). WLAD has expanded over the years to bar discrimination on the basis of age, sex, sexual orientation, and disability, and to incorporate a private right of action for employees and persons who use public accommodations. *See* RCW 49.60.040.

As enacted, the law exempted from the definition of "employer" "any religious, charitable, educational, social or fraternal association or corporation, not organized for private profit." LAWS OF 1949, ch. 183, § 3(b). In 1957, the legislature rewrote the definition of "employer" to its present form, bringing

---

[1] Five amicus briefs were filed in this case by (1) Washington State Association for Justice Foundation, (2) Washington Employment Lawyers Association and Legal Voice, (3) American Civil Liberties Union of Washington and Anti-Defamation League, (4) Pacific Northwest Conference of the United Methodist Church, Olympia Diocese of the Episcopal Church, and Presbytery of Seattle of the Presbyterian Church USA, and (5) Religious Organizations.

[2] WLAD is a regulatory law enacted under the legislature's police power to promote the health, peace, safety, and general welfare of the people of Washington. *See* RCW 49.60.010.

secular nonprofit organizations within the statute's ambit and exempting only small employers and religious nonprofits. *See* LAWS OF 1957, ch. 37. The definition of "employer" for purposes of WLAD is currently found in RCW 49.60.040(11), which provides, "'Employer' includes any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for private profit."

The WLAD religious employer exemption has been examined in two earlier cases raising arguments under the state constitution, but in neither case did we expressly reach the state constitutional issue. The first came in 1991, when Nancy Farnam, an employee of a religious nursing home, challenged her dismissal for reporting the removal of a patient's gastric tube. *Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 662-66, 807 P.2d 830 (1991). Farnam argued that the WLAD exemption was invalid under article I, section 11 and article I, section 12 of the Washington Constitution. We noted that the arguments were presented to us without sufficient briefing analyzing the state constitutional claims, and we declined to address their merits. However, we noted that we rejected a similar challenge to the federal exemption under the equal protection clause, in *American*

*Network, Inc. v. Utilities & Transportation Commission*, 113 Wn.2d 59, 77, 776 P.2d 950 (1989). *Farnam*, 116 Wn.2d at 681.

A second state constitutional challenge to the religious employer exemption came in 2010, when Angela Erdman, a church elder employed in a secular position, was dismissed on the recommendation of the church tribunal. *Erdman v. Chapel Hill Presbyterian Church*, 156 Wn. App. 827, 234 P.3d 299 (2010) (*Erdman* I), rev'd on other grounds by *Erdman*, 175 Wn.2d 659, 286 P.3d 357 (2012) (*Erdman* II). Erdman challenged the dismissal, asserting several causes of action, including a violation of WLAD. Moving for summary judgment dismissal of Erdman's WLAD claim, the church asserted the religious employer exemption. Erdman countered that the exemption was an unconstitutional privilege or immunity under article I, section 12 because it interfered with her fundamental right to pursue an occupation. Just as in *Farnam*, the Court of Appeals found that Erdman had cited "no relevant authority" to support her state constitutional claim and declined to examine the merits. *Erdman* I, 156 Wn. App. at 849. We did not take review of Erdman's article I, section 12 claim and resolved the case on other grounds. *See Erdman* II, 175 Wn.2d at 683.

Here, we are asked to confront the question of whether the religious employer exemption violates article I, section 11 or article I, section 12 of the Washington Constitution.

a. Article I, section 12

Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." Passed during a period of distrust toward laws that served special interests, the purpose of article I, section 12 is to limit the sort of favoritism that ran rampant during the territorial period. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 26-27 (G. Alan Tarr ed., 2002). Although the text of clause was modeled after a similar provision in Oregon's 1859 Constitution, Washington's framers explicitly broadened the reach of the clause by including "corporations" in the language of article I, section 12. *See State v. Smith*, 117 Wn.2d 263, 285, 814 P.2d 652 (1991) (Utter, J., concurring). Our cases have consistently recognized that the text and aims of article I, section 12 differ from that of the federal equal protection clause. Whereas the Fourteenth Amendment was generally intended to prevent discrimination against disfavored individuals or groups, article I, section 12 was intended to

prevent favoritism and special treatment for a few, to the disadvantage of others. *See Smith*, 117 Wn.2d at 283 (Utter, J., concurring).

Despite the historical and textual differences, Washington courts often construed article I, section 12 consistent with the federal equal protection clause for most of the latter half of the previous century. In 2002, however, we recognized some distinctions, and applying the *Gunwall*[3] factors, concluded that article I, section 12, can in certain circumstances, support an analysis independent of that of the Fourteenth Amendment. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 83 P.3d 419 (2004) (*Grant* II). Under that approach, we embraced a two-step analysis. The first step is to analyze whether the law in question involves a privilege or immunity. If there is no privilege or immunity involved, then article I, section 12 is not implicated. *Grant* II, 150 Wn.2d at 812.[4] If, on the other hand, the law involves a privilege or immunity, the second step in the analysis asks whether the legislature had a "reasonable ground" for granting the

---

[3] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

[4] If there is no privilege or immunity involved, this leaves only the question of whether the challenged statute violates the equal protection clause of the federal constitution. *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 608, 192 P.3d 306 (2008). Whether the exemption of religious nonprofits from WLAD violates the federal equal protection clause is not a question of state law certified to this court.

privilege or immunity. *See Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 731, 42 P.3d 394 (2002) (*Grant* I).[5]

Before beginning this analysis, it is important to recognize the breadth of the claim presented. Although much of the argument focuses on *this claim* against *this hospital*, the issue is far more significant and broader given the certified questions. We are asked to declare as unconstitutional the exemption for *all* religious nonprofits, which extends to not only this case, but all other employers covered by the exemption, including universities, elementary schools, Catholic Community Services, Jewish Family Services, CRISTA Ministries, YMCA, YWCA, Salvation Army, and St. Vincent De Paul. Arguably, churches, synagogues, and mosques would be exposed as well. We further note that since enacted in 1949, the legislature has not revised this exemption to limit its scope. With that said, we turn to whether the definition of "employer" in RCW 49.60.040(11) involves a privilege or immunity.

---

[5] When we reconsidered that decision in *Grant* II, we did not reach the reasonable-grounds test but vacated *Grant* I on the sole ground that "no privilege, i.e., fundamental right of state citizenship, [was] at issue in this case." *Grant* II, 150 Wn.2d at 814.

i. *Does RCW 49.60.040(11) grant a privilege or immunity?*[6]

Ockletree argues that under the dictionary definition of "privilege," "the right to work free from discrimination is a privilege of citizenship" and that the legislature grants this "privilege" on unequal terms. Corrected Pl.'s Reply Br. at 14. He further argues that the legislature grants religious employers "'immunity' from the antidiscrimination laws applicable to other employers and, thus, grants them a 'privilege' to discriminate against employees" without civil liability. Pl.'s Opening Br. at 28. FHS counters that the dictionary definition of "privilege" is not coextensive with the meaning we give that term in the context of article I, section 12, and that the definition of "employer" in RCW 49.60.040(11) does not involve a privilege or immunity for purposes of that section.

As FHS correctly observes, in a constitutional sense a privilege has been more narrowly construed than the arguments advanced by Ockletree. In defining the scope of a privilege, we have emphasized that "not every statute authorizing a particular class to do or obtain something involves a 'privilege' subject to article I, section 12." *Grant II*, 150 Wn.2d at 812.[7] Rather, in early cases, we clarified that

---

[6] As the parties note, we have at times used the terms "privilege" and "immunity" interchangeably. Because the parties treat them as synonymous in this case, we will do the same. And to the extent that they are designed to avoid favoritism, they are the same.

[7] In fact, since announcing an independent interpretation of article I, section 12, we have not found a statute to violate the privileges and immunities clause. *See Am. Legion*, 164 Wn.2d at

the term "privileges and immunities" refers "alone to those fundamental rights which belong to the citizens of [Washington] by reason of such citizenship." *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902). Accordingly we have held that not every legislative classification constitutes a "privilege" within the meaning of article I, section 12 but only those where it is, "in its very nature, such a fundamental right of a citizen that it may be said to come within the prohibition of the constitution, or to have been had in mind by the framers of that organic law." *Vance*, 29 Wn. at 458-59. As we said in *Vance*,

> [a] statute can be declared unconstitutional only where specific restrictions upon the power of the legislature can be pointed out, and the case shown to come within them, and not upon any general theory that the statute conflicts with a spirit supposed to pervade the constitution, but not expressed in words.

*Vance*, 29 Wn. at 459 (citing *Smith v. City of Seattle*, 25 Wash. 300, 65 P. 612 (1901)). Generally, rights left to the discretion of the legislature have not been considered fundamental. *Grant* II, 150 Wn.2d at 814.

Ockletree asks us to embrace a broader meaning of "privilege or immunity" for purposes of article I, section 12 to mean any exemption in derogation of common right. Pl.'s Opening Br. at 28 n.14. However, accepting Ockletree's broad definition not only would be inconsistent with our article I, section 12

---

606-07; *Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 103, 178 P.3d 960 (2008); *Madison v. State*, 161 Wn.2d 85, 96-97, 163 P.3d 757 (2007) (plurality opinion); *Andersen v. King County*, 158 Wn.2d 1, 16, 138 P.3d 963 (2006) (plurality opinion); *Grant* II, 150 Wn.2d at 816.

11

jurisprudence but could also produce harmful consequences. Accepting Ockletree's definition means recognizing a privilege anytime a statute grants a right to some but not others. In other words, many legislative decisions could be claimed as privileges. As a result, we could be called upon to second-guess the distinctions drawn by the legislature for policy reasons nearly every time it enacts a statute. For example, the property tax exemptions for citizens "[s]ixty-one years of age or older" and "veterans with one hundred percent service-connected disabilities" could be challenged as unconstitutional grants of special privileges to certain classes of citizens but not others. RCW 84.36.381(3)(a)(i), .379. Similarly, exemptions from emission control inspections for "[f]arm vehicles," "[s]treet rod vehicles," "[h]ybrid motor vehicles," and "[c]lasses of motor vehicles exempted by the director of the department of ecology," among others, would all be subject to challenge under article I, section 12. RCW 46.16A.060(2)(e), (f), (h), (i). We therefore reject Ockletree's invitation to broaden the meaning of the word "privilege" for purposes of article I, section 12 and reiterate that a privilege in this context is limited to those fundamental rights of citizenship.

Ockletree's argument seems to be that a cause of action for discrimination by a private actor in a private employment setting is a fundamental right of citizenship. However, Ockletree's assertion has no support in our jurisprudence or

in any other state or federal court. As amici Religious Organizations notes, absent state action, courts have uniformly declined to prohibit employment discrimination on constitutional grounds. *See Moran v. GTECH Corp.*, 989 F. Supp. 84, 93 (D.R.I. 1997); *Am. Nat'l Ins. Co. v. Fair Emp't & Hous. Comm'n*, 32 Cal. 3d 603, 619, 651 P.2d 1151, 186 Cal. Rptr. 345 (1982) (Mosk, J., dissenting); *Ky. Comm'n on Human Rights v. Fraser*, 625 S.W.2d 852, 854 (Ky. 1981). Because discrimination in private employment cannot "be said to come within the prohibition of the constitution," it is not a fundamental right. Rather, protection from discrimination in private employment is a creature of statutory enactment. Notably, WLAD was not enacted until 1949, over half a century after the adoption of our constitution. And the private cause of action under the statute was not created until 1973. LAWS OF 1973, ch. 141. Moreover, the exemption for religious organizations has been part of the antidiscrimination statute from the time it was enacted and has never been amended. The timing of WLAD's enactment further supports our conclusion that the right at issue here is not fundamental to state citizenship and is therefore not a privilege within the meaning of article I, section 12.

Our determination concerning the nature of the right at issue here is also consistent with our holding in *Griffin*, 130 Wn.2d 58. In *Griffin*, we considered and

rejected a similar challenge involving the exemption in WLAD for employers with fewer than eight employees. There, we applied a federal equal protection analysis and held that the small employer exemption does not violate article I, section 12. Notably, in that case we said that the protections extended by the law against discrimination involve an "important" right, not a fundamental right. *Griffin*, 130 Wn.2d at 65. And we evaluated the small employer exemption using rational basis review, an approach that traditionally does not apply to fundamental rights. *See Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 222, 143 P.3d 571 (2006) ("When state action does not affect a fundamental right, the proper standard of review is rational basis."). If we accepted Ockletree's argument that the right at issue here is fundamental, we would be implicitly embracing strict scrutiny for analyzing the exemption under the federal equal protection clause. *See Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 609, 192 P.3d 306 (2008) (strict scrutiny applies to laws burdening fundamental rights). As such, our decision would be at odds with our analysis and conclusion in *Griffin*. Instead, we adhere to what we recognized and held in *Griffin* that a right of action for discrimination in private employment is an important right, but not a fundamental one. Therefore, it is not a privilege in the state constitutional sense.

14

Ockletree also contends that RCW 49.60.040(11) implicates the fundamental right to "'carry on business'" within the state, and that the statute grants an exemption to religious hospitals that does not belong to secular hospitals carrying on the same business. Corrected Pl.'s Reply Br. at 15 (quoting *Am. Legion*, 164 Wn.2d at 607).[8] However, we rejected the notion that the privileges and immunities clause is violated anytime the legislature treats similarly situated businesses differently in *American Legion*. *See Am. Legion*, 164 Wn.2d at 607. There, we considered an article I, section 12 challenge to a law that banned smoking in a public place or in any place of employment. As in this case, the petitioner argued that the law involved the fundamental right to carry on business, and that the law treated two similarly situated businesses differently in violation of the privileges and immunities clause. We disagreed and clarified that "a 'privilege' normally relates to an exemption from a regulatory law that has the effect of benefiting certain businesses at the expense of others." *Am. Legion*, 164 Wn.2d at 607. We held in *American Legion* that the law did not involve a privilege for purposes of article I, section 12 because the law did not prevent any entity from engaging in business. Rather, we said that the law merely prohibited smoking within a place of employment, which is not a fundamental right of citizenship.

---

[8] This argument is not particularly helpful to the certified question because as noted, Ockletree's challenge is not limited to employment in religious hospitals. Rather, he challenges the exemption facially, which covers *all* religious employers, including churches and schools.

Here, Ockletree fails to establish how RCW 49.60.040(11) confers a benefit to religious nonprofits at the expense of other organizations that are subject to WLAD. While Ockletree asserts that religious nonprofits are not subject to "liability for damages under WLAD or the costs attendant on statutory compliance," he fails to show how secular employers who are subject to the antidiscrimination law bear any greater expense or costs because religious nonprofits are exempt, and we find no basis to support that argument. Pl.'s Opening Br. at 28.[9] Thus, the exemption does not offend the anticompetitive concerns underlying article I, section 12. Moreover, nonprofits run by religious organizations were not the type of powerful business interests that the framers of article I, section 12 had in mind when drafting that section. As Ockletree acknowledges, article I, section 12 was historically applied "'in a manner consistent with its aim of eliminating governmental favoritism toward certain business interests.'" Pl.'s Opening Br. at 24 (quoting Michael Bindas, Seth Cooper, David K. DeWolf & Michael J. Reitz, *The Washington Supreme Court and the State Constitution: A 2012 Assessment*, 46 GONZ. L. REV. 1, 25 (2010/11)).

---

[9] Ockletree also attempts to distinguish *American Legion* on the grounds that while smoking is not a fundamental right of citizenship, the legislature "has declared that the right to work free from discrimination is a privilege of citizenship." Corrected Pl.'s Reply Br. at 14 (citing 49.60.010). But RCW 49.60.010 does not state that the right to be free from discrimination is a privilege, rather it says that "discrimination threatens . . . the rights and proper privileges of its inhabitants."

Finally, Ockletree's assertion that WLAD authorizes religious nonprofits to discriminate is without merit. The statute plainly does not state that religious nonprofits can discriminate against employees on the bases listed. And religious nonprofits are arguably subject to federal antidiscrimination laws. It may be that Ockletree could find protection under federal law, but we leave that issue to the federal court to decide. Here, we conclude only that, under an analysis independent of the federal equal protection clause, article I, section 12 does not apply to invalidate the religious nonprofit exemption in WLAD.

### ii.     Is there a "reasonable ground" for the classification?

Even if the exemption in WLAD for religious nonprofits did implicate a "privilege or immunity," Ockletree's article I, section 12 challenge falls short because reasonable grounds exist for this distinction. In *Grant* I, we derived the "reasonable ground" test for privileges and immunities challenges from our early 20th century cases. The test comprises two prongs: first, whether the law applies equally to "all persons within a designated class," and second, whether there is a "reasonable ground for distinguishing between those who fall within the class and those who do not." *Grant* I, 145 Wn.2d at 731.[10] To meet the reasonable ground

---

[10] As previously noted, we did not reach the reasonable grounds test in *Grant* II. Instead, we vacated *Grant* I on the sole ground that "no privilege, i.e., fundamental right of state citizenship, [was] at issue in this case." *Grant* II, 150 Wn.2d at 814. Therefore, the reasonable grounds test, as articulated in *Grant* I, is still good law and is the applicable test here.

requirement, distinctions must rest on "real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act." *State ex rel. Bacich v. Huse*, 187 Wash. 75, 84, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979). Here, no one disputes that the challenged exemption applies equally to all religious nonprofits. The question, then, is whether there is a "reasonable ground" for distinguishing between religious nonprofits and other nonprofits.

As amici Pacific Northwest Conference of the United Methodist Church (amici United Methodist Church) notes, there are real and substantial differences between religious nonprofits and secular nonprofits that make it reasonable for the legislature to treat them differently under WLAD. One of the primary differences is that religious organizations have a right to religious liberty guaranteed by the state free exercise clause under article I, section 11. We have recognized that article I, section 11 provides greater protection for the free exercise of religion than the First Amendment. *First Covenant Church v. City of Seattle*, 120 Wn.2d 203, 226, 840 P.2d 174 (1992). The free exercise clause provides, "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion." WASH. CONST. art. I, § 11. Amici United

18

Methodist Church notes that this is the reason religious organizations may, and indeed sometimes must, be treated differently than nonreligious organizations.

The United States Supreme Court has recognized that exemptions for religious organizations from civil discrimination suits protect religious freedom by avoiding state interference with religious autonomy and practice. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987). In *Amos*, the Court considered a challenge to the exemption of religious organizations from Title VII of the Civil Rights Act of 1964's (Title VII), 42 U.S.C. § 2000e, prohibition against discrimination in employment. There, the Court rejected the argument that applying the exemption to cover the "secular" activities of religious employers violated the establishment clause of the United States Constitution. The Court explained that

> it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.

*Amos*, 483 U.S. at 336 (footnote omitted). The Court further rejected the argument that the exemption violated equal protection principles by giving less protection to

employees of religious organizations than employees of secular employers. Applying rational basis review, the Court upheld the exemption on the basis that it "is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. We agree with this reasoning.

Here, the religious employer exemption satisfies the reasonable ground test because it similarly accommodates the broad protections to religious freedoms afforded by Washington's article I, section 11. The legislature gives effect to these protections by choosing to avoid potential entanglements between the state and religion that could occur in enforcing WLAD against religious nonprofits. As amici Religious Organizations points out, the wide scope of WLAD justifies the broader exemption under the WLAD for religious employers than under Title VII. In addition to the classes covered by Title VII, the WLAD extends employment discrimination protection to classes such as age, sexual orientation, gender identity, and marital and veteran status. RCW 49.60.030, .180. Amici Religious Organizations notes that the legislature made a reasonable policy choice to avoid the potential pitfalls of attempting to reconcile Washington's growing list of protected categories (arguably, many of which with a religious aspect) with the

multitude of religious belief systems. Moreover, as noted by amici, similarly broad exemptions for religious employers have been upheld in other states. *See Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 997 (C.D. Cal. 2000) (finding California's blanket exemption of all religious nonprofit organizations from the state antidiscrimination statute constitutional). Because of the evidentiary standards and the nature of the inquiry for discrimination claims, the legislature could reasonably conclude that religious organizations should be relieved of the burden of predicting when their religious beliefs would be regarded as sufficient justification for an employment decision.[11]

b. Article I, section 11

The second question presented is whether the exemption of religious nonprofit employers from WLAD violates the establishment clause of article I, section 11. Article I, section 11 provides in part, "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment."

Ockletree initially asserts that WLAD's definition of "employer" favors religious nonprofits and that such favor constitutes "support" for "religious

---

[11] It is worth stressing that we do not hold that the state free exercise clause *requires* such a broad exemption for religious organizations under WLAD, rather we hold only that a reasonable ground exists to distinguish between religious and secular organizations based on the potential for government interference with religious freedoms in enforcing WLAD against religious nonprofits.

establishment[s]" in violation of article I, section 11.[12] However, Ockletree misconstrues the meaning of the phrase "support of any religious establishment." We previously clarified that "[t]he terms 'appropriated' and 'applied' modify religious worship, exercise or instruction, and the support of any religious establishment. Thus, what article I, section 11 prohibits is the 'appropriation' . . . of public money to any of these enumerated purposes." *State ex rel. Gallwey v. Grimm*, 146 Wn.2d 445, 466, 48 P.3d 274 (2002); *see also Malyon v. Pierce County*, 131 Wn.2d 779, 793, 935 P.2d 1272 (1997) ("The state provision explicitly prohibits appropriation or application of public money or property for four explicit purposes, religious worship, religious exercise, religious instruction, and support of any religious establishment."). Therefore, we have said that an establishment clause challenge requires us to ask two questions: "(1) Is 'public money or property' involved? and (2) If so, is it to be 'appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment'?" *Wash. Health Care Facilities Auth. v. Spellman*, 96 Wn.2d 68,

---

[12] Ockletree also argues that the WLAD exemption is invalid for "justify[ing] practices inconsistent with the peace and safety of the state." WASH. CONST. art. I, § 11. But this language pertains to the free exercise clause, not the establishment clause, and Ockletree does not challenge the exemption on free exercise grounds. Thus, the "peace and safety" provision is irrelevant to our analysis.

71, 633 P.2d 866 (1981). Where no public money or property is involved, we need not reach the second question. *Wash. Health Care Facilities Auth.*, 96 Wn.2d 68.[13]

Ockletree asserts that "[i]n the event this Court limits article I, section 11 to circumstances where public money or property is provided to a religious organization, the WLAD religious nonprofit exemption is still unconstitutional because the exemption . . . provides a financial benefit." Pl.'s Opening Br. at 44. Ockletree argues that the challenged exemption provides indirect financial support to religious nonprofits by relieving them "from the necessary financial costs of compliance with WLAD and potential damages for violation." Pl.'s Opening Br. at 46. Indirect financial support, Ockletree contends, "violates the state Constitution just as much as direct payment of funds." Pl.'s Opening Br. at 44.

We find nothing in our case law, however, to support Ockletree's position. To the contrary, our establishment clause jurisprudence makes clear that an *indirect* financial benefit to a religious organization does not violate the state constitution. For instance, in *Washington Health Care Facilities Authority*, we held that allowing religious hospitals to raise money through tax exempt bonds did not

---

[13] As FHS correctly observes, Ockletree's *Gunwall* analysis of article I, section 11 is unnecessary and unhelpful. We have already determined that a different interpretation should apply under the state establishment clause as compared with the federal establishment clause. *Malyon*, 131 Wn.2d at 798.

23

violate article I, section 11. In determining whether public money or property was involved, we reasoned:

> The only "public" financial assistance given borrower hospitals here is indirect, not measurable in dollars, and is not state aid: Those who receive the interest from tax exempt bonds are relieved of the obligation to pay a tax on this income. This tax relief can hardly be called an appropriation or application of public money unless the income which is taxed is claimed to be public money in the first place.

*Wash. Health Care Facilities Auth.*, 96 Wn.2d at 73. Notably, in discussing *Washington Health Care Facilities Authority* in a later case, we said that "[b]y making this method of financing available to a private religious institution *the state conferred a tremendous financial benefit on a religious establishment but without violating the state constitution in the slightest.*" *Malyon*, 131 Wn.2d at 801 (emphasis added). By contrast, in *Visser*, which Ockletree cites for support, we held that providing free transportation to or from religious schools violated article I, section 11 because it constituted "a direct, substantial, and continuing public subsidy to the schools." *Visser v. Nooksack Valley Sch. Dist. No. 506*, 33 Wn.2d 699, 708, 207 P.2d 198 (1949).

As FHS points out, this case is unlike *Visser*, where publicly funded transportation to and from religious schools provided a direct financial benefit by defraying the costs those schools would have otherwise incurred for student transportation. Here, on the other hand, no public funding is implicated by

WLAD's definition of "employer." It is simply a definition. Thus, the exemption of religious employers from WLAD provides no "direct" financial benefit or subsidy to religious nonprofit organizations. Rather, any benefit received by the religious employers as a result of the exemption from discrimination suits is indirect. Because the challenged exemption from WLAD does not implicate public funding or property, we find no violation of article I, section 11.

CONCLUSION

We answer the certified questions as follows:

(1) WLAD's definition of "employer" under RCW 49.60.040(11) does not involve a privilege or immunity, and therefore does not violate article I, section 12's privileges and immunities clause.

(2) WLAD's definition of "employer" under RCW 49.60.040(11) does not involve the appropriation of money or application of property, and therefore does not fall within the prohibition of article I, section 11's establishment clause.

WE CONCUR:

No. 88218-5

STEPHENS, J. (dissenting)—The lead opinion begins with an uncontroversial proposition: religious institutions hold a special place in our society and may be granted certain statutory exemptions without offending the constitution. But it elevates this proposition to unprecedented heights and deprives Washington's article I, section 12 privileges and immunities clause of its intended meaning by disclaiming any limits on the ability of religious-affiliated corporations to engage in discrimination unrelated to their religious beliefs or practices. The broad exemption of religious nonprofit corporations from Washington's Law Against Discrimination (WLAD), at RCW 49.60.040(11), cannot constitutionally be applied to allow race or disability discrimination against a hospital security guard. Because such discrimination is not protected as part of religious exercise and indeed violates the federal First Amendment establishment clause, it cannot satisfy the "reasonable ground" standard under article I, section 12. I would hold the exemption violates this provision as applied to WLAD claims based on

discrimination that is unrelated to an employer's religious purpose, practice, or activity, and answer yes to certified question number 2, as to article I, section 12.[1]

## DISCUSSION

### I. Article I, Section 12's Privileges and Immunities Clause Protects Rights Guaranteed to all Washington Citizens

Article I, section 12 of the Washington constitution was adopted against a backdrop of legislative misconduct that is almost unimaginable today. The framers lived in a time when the "'wholesale corruption of state legislatures [was] laughed at by honest men throughout America.'" JAMES LEONARD FITTS, THE WASHINGTON CONSTITUTIONAL CONVENTION OF 1889, at 28-29 (1951) (unpublished MA thesis, University of Washington) (on file with Washington State Law Library) (alteration in original) (quoting TACOMA DAILY LEDGER (July 19, 1889)). The territorial legislature was no exception, and "spent much of its time granting special acts or privileges." 1 WILFRED J. AIREY, A HISTORY OF THE CONSTITUTION AND GOVERNMENT OF WASHINGTON TERRITORY 208 (1945) (unpublished PhD dissertation, University of Washington) (on file with Washington State Law Library). Prior to statehood, "[r]ailroads were chartered but

---

[1] The lead opinion never addresses the second certified question, which concerns Ockletree's as-applied challenge, choosing instead to highlight the dramatic potential for declaring the exemption unconstitutional "for *all* religious nonprofits . . . including universities, elementary schools, Catholic Community Services, Jewish Family Services, CRISTA Ministries, YMCA, YWCA, Salvation Army, and St. Vincent De Paul," not to mention "churches, synagogues, and mosques." Lead opinion at 9. In fact, when it offers answers to the questions posed, the lead opinion considers only the *facial* challenge and mistakenly divides the questions into (1) article I, section 12 and (2) article I, section 11. Lead opinion at 25. It therefore does not explain how RCW 49.60.040(11) can be *applied* to allow employment discrimination on grounds wholly unrelated to religious exercise without violating article I, section 12.

never built; the actions of inexperienced Territorial officials were legalized; private laws authorizing the building of bridges, the establishing of ferries, or the incorporating of companies often with nearly monopolistic powers, were passed regularly." *Id.* (footnote omitted).

Delegates to the Washington constitutional convention were united in their desire to reign in these abuses. FITTS, *supra,* at 28-29; Jonathan Thompson, *The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?,* 69 TEMP. L. REV. 1247, 1277-78 (1996); *see* ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A Reference Guide 39 (2d ed. 2013). Antipathy for unchecked legislative power was so pervasive that one member remarked, "'If . . . a stranger from a foreign country were to drop into this convention, he would conclude that we were fighting a great enemy, and that this enemy is the legislature.'" FITTS, *supra,* at 29 (quoting TACOMA DAILY LEDGER (Aug. 9, 1889).

Despite striking differences between the text and historical roots of article I, section 12 and the federal equal protection clause, Washington courts construed the two provisions in lockstep for many years. *See, e.g., State v. Smith,* 117 Wn.2d 263, 281, 814 P.2d 652 (1991). In 2002 we reversed course, applying the *Gunwall*[2] factors and concluding that article I, section 12 warrants separate analysis "when the threat is not of majoritarian tyranny but of a special benefit to a

---

[2] *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986).

minority and when the issue concerns favoritism rather than discrimination." *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 725-31, 42 P.3d 394 (2002) (*Grant County* I), *rev'd on reh'g on other grounds*, 150 Wn.2d 791, 83 P.3d 419 (2004) (*Grant County* II); *see Gunwall*, 106 Wn.2d at 61-62 (setting forth six nonexclusive factors for determining whether the Washington Constitution provides more protection than the United States Constitution). On rehearing, we reversed results but not direction, upholding the law at issue but sustaining our *Gunwall* holding from *Grant County* I. 150 Wn.2d at 806-11 (holding that "the Washington State provision requires independent analysis from the federal provision when the issue concerns favoritism").[3]

After *Grant County* II, some confusion remained over whether article I, section 12 is more protective only when the challenged law is "a grant of positive favoritism to a minority class." *Andersen v. King County*, 158 Wn.2d 1, 16, 138 P.3d 963 (2006). In 2007, a plurality rejected this requirement, holding that article I, section 12 has more "bite" whenever a law confers a privilege or immunity, not

---

[3] The lead opinion claims we do not conduct equal protection analysis as a matter of state law. Lead opinion at 8 n.4. The lead opinion is wrong. Unless a statute implicates a privilege or immunity of state citizenship, Washington courts apply "the same constitutional analysis under the state constitution's privileges and immunities clause that is applied under the federal constitution's equal protection clause." *Andersen v. King County*, 158 Wn.2d 1, 9, 138 P.3d 963 (2006) (plurality opinion); *see Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 608, 192 P.3d 306 (2008) (plurality opinion) (noting that "[e]qual protection under the law is required by both the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Washington Constitution"); *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 140-44, 960 P.2d 919 (1998) (applying equal protection analysis as a matter of state constitutional law); *Griffin v. Eller*, 130 Wn.2d 58, 64-65, 922 P.2d 788 (1996) (same); *see generally* UTTER, *supra*, at 39 (describing Washington's equal protection doctrine). The lead opinion's disregard of this long-standing doctrine is unwarranted and unexplained.

-4-

just when it benefits a "minority class." *Madison v. State*, 161 Wn.2d 85, 94 n.6, 163 P.3d 757 (2007). And in two cases in 2008, the issue was settled when a majority of the court applied the *Madison* plurality approach and declined to examine whether the laws at issue affected a "minority class." *See Am. Legion*, 164 Wn.2d at 606-08; *Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 102-04, 178 P.3d 960 (2008).

The lead opinion concedes that Ockletree's right to hold employment free from discrimination is important but argues it is not "fundamental" and therefore not protected by article I, section 12. Lead opinion at 14. The lead opinion mistakes the privileges and immunities of state citizenship protected by article I, section 12 for the fundamental rights of all Americans guaranteed by the federal due process clause.

Due process protects a variety of fundamental rights under the banner of "liberty," including the rights to marry, to have and raise children, to obtain contraception and an abortion, and to refuse medical treatment. *See generally Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Infringements of these fundamental rights are permissible only if "'narrowly tailored to serve a compelling state interest.'" *Id.* at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

By contrast, Washington's privileges and immunities clause guarantees equal protection of the laws, but also protects those ""'fundamental rights which belong to the citizens of the state by reason of such citizenship.'"" *Ventenbergs*,

163 Wn.2d at 103 (quoting *Grant County* II, 150 Wn.2d at 813 (quoting *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902))). This court has never suggested that these rights are limited to those deserving heightened scrutiny under federal law. Rather, these rights are more prosaic than the "fundamental rights" guaranteed by due process, and include "the right to . . . carry on business" in the state, "to acquire and hold property, and to protect and defend the same in the law," and "to enforce other personal rights." *Vance*, 29 Wash at 458.

By conflating distinct constitutional doctrines, the lead opinion asks us to believe that the framers of Washington's constitution ratified the privileges and immunities clause in 1889 to safeguard rights that would not be consolidated under federal due process for a generation. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (broadening the scope of "liberty" to include these personal rights). Even if I were prepared to accept this view, the lead opinion's sweeping reinterpretation of article I, section 12 would require us to overturn cases dating back to territorial days in which we upheld laws under a standard less stringent than strict scrutiny. Indeed, under its reasoning, article I, section 12 would seem to guarantee Washington citizens the solemn and fundamental right to sell cigars, animal feed, and eggs. *See State v. W.W. Robinson Co.*, 84 Wash. 246, 249, 146 P. 628 (1915) (animal feed); *City of Seattle v. Dencker*, 58 Wash. 501, 502-03, 108 P. 1086 (1910) (cigars); *In re Habeas Corpus of Camp*, 38 Wash. 393, 396, 80 P. 547 (1905) (eggs).

The improbability that the framers of the constitution intended to ensconce such a right strongly suggests that the rights protected by article I, section 12 and the due process clause are not the same. The WLAD exemption is subject to heightened scrutiny if it grants a privilege or immunity of state citizenship to religious nonprofits. Whether the statute also infringes liberty interests protected by due process is irrelevant to its status under article I, section 12.

### II. The Right To Sue for Discriminatory Dismissal Is a Privilege of Washington Citizenship Protected by Article I, Section 12

The lead opinion is correct that not every statute favoring one class of employers over another grants a "privilege or immunity" under article I, section 12. Lead opinion at 10 (citing *Grant County* II, 150 Wn.2d at 812). Privileges and immunities "'pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship.'" *Grant County* II, 150 Wn.2d at 812-13 (quoting *Vance*, 29 Wash. at 458).

In *Vance*, 29 Wash. at 458, we explained that article I, section 12 protects "the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights." Under long-settled law, article I, section 12 protects the broad privilege of Washington citizens to bring claims in state court. *See id.*; *Cotten v. Wilson*, 27 Wn.2d 314, 317-20, 178 P.2d 287 (1947) (holding the right to sue in negligence is a privilege of state citizenship protected by article I, section 12); *see also Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823)

(Washington, J.) (holding that among the privileges and immunities of all state citizens is the right "to institute and maintain actions of any kind in the courts of the state").

In contrast, a right granted only at the discretion of the legislature is not a "privilege" any citizen can assert. For example, there is no privilege to petition for annexation because the legislature enjoys plenary authority to adjust municipal boundaries. *Grant County* II, 150 Wn.2d at 813-14. Likewise, the legislature has authority to create or repeal causes of action unrelated to common law claims, and it does not grant or withhold a privilege when it does so. *See Atchison v. Great W. Malting Co.*, 161 Wn.2d 372, 381, 166 P.3d 662 (2007) (wrongful death).

The lead opinion is simply wrong when it states that the "protection from discrimination in private employment is a creature of statutory enactment." Lead opinion at 13. The WLAD itself makes clear that employment free from discrimination rests at the core of the sort of "personal rights" this court in *Vance* identified as fundamental. 29 Wash. at 458. The WLAD was enacted "in fulfillment of the provisions of the Constitution of this state concerning civil rights," to protect "the rights and proper privileges" of state citizens, RCW 49.60.010, and resounds with provisions confirming the right to seek redress beyond its own remedies. Indeed, well before the legislature created a statutory right of action in 1973, it included the following language in RCW 49.60.020: "Nor shall anything herein contained be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged

violation of his or her civil rights." LAWS OF 1957, ch. 37, § 2; *see Griffin v. Eller*, 130 Wn.2d 58, 84 n.7, 922 P.2d 788 (1996) (Talmadge, J., dissenting) (setting out legislative history).

Importantly, the WLAD recognizes that freedom from discrimination is a *civil right*, not merely a statutory promise. RCW 49.60.030(1) (declaring that the "civil right" to be free from discrimination includes "[t]he right to obtain and hold employment without discrimination"); *see also* RCW 49.60.010 (declaring that discrimination against any citizen because of, inter alia, race or disability is "a matter of state concern," and that such discrimination "menaces the institutions and foundation of a free democratic state"). It is simply incredible for the lead opinion to suggest that Washington citizens enjoyed no state common-law remedy for discrimination until 1973—and that even today they must rely on state and federal legislative grace to vindicate their rights.

The lead opinion relies on *Griffin*, asserting that the religious employer exemption and the small business exemption reflect the same rational basis in lifting the burden of enhanced statutory remedies. Lead opinion at 13. Maybe so, but this does not answer whether the exemption affects a fundamental right for purposes of the state privileges and immunities clause. *Griffin* was resolved solely under an equal protection analysis. 130 Wn.2d at 65. While we held in *Griffin* that the small employer exemption survived the traditional federal rational basis review, we did not suggest it would survive an independent state privileges and immunities analysis. 130 Wn.2d at 64-65. Though *Griffin* is not on point, in

considering the privileges and immunities clause in this context, "[w]e do not write on a clean slate." *Madison*, 161 Wn.2d at 114 (Madsen, J., concurring). In *Cotten*, 27 Wn.2d at 317-20, this court struck down a state law that required injured plaintiffs to prove gross negligence on the part of certain common carriers on privileges and immunities grounds. We held that injured persons would otherwise have benefited from the state common-law rule, under which "the carrier is held to the highest degree of care for the safety of its passengers, and the plaintiff is required to prove only slight negligence." *Id.* at 317. Because the law shielded carriers against a cause of action belonging to every state citizen, deemed a fundamental right, we held it was an impermissible grant of a privilege or immunity. *Id.*; *see* Thompson, *supra,* at 1276 (describing *Cotten* as an "immunity" case). The case before us is no different. Ockletree persuasively argues that the right to be free from discriminatory employment practices is easily as fundamental as the commercial rights that our early article I, section 12 cases addressed. *See* Pl.'s Opening Br. at 27 n.13. I would recognize that exempting nonprofit religious employers from WLAD claims bestows a "privilege" or "immunity" on them within the meaning of the article I, section 12 privileges and immunities clause.

### III. There Is No "Reasonable Ground" for Privileging Religious Nonprofits over Secular Ones

A law that grants a privilege or immunity to any citizen, group of citizens, or corporation not available to all on the same terms violates article I, section 12 unless there is "reasonable ground for distinguishing between those who fall within

the class and those who do not." *Grant County* I, 145 Wn.2d at 731. A distinction is reasonable if it has "a natural, reasonable, and just relation to the subject matter of the act." *State ex rel. Bacich v. Huse*, 187 Wash. 75, 84, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 947, 603 P.2d 819 (1979).

Although this test resembles certain articulations of rational basis review, the two are not identical. As Professor Thompson notes, Washington courts refrain from "hypothesizing facts" to justify a distinction under article I, section 12, and do not extend the legislature permission to "proceed incrementally," instead taking a statute as they find it. Thompson, *supra*, at 1278-79. The legislature is already forbidden from drawing arbitrary distinctions, both under the federal and state equal protection clauses and state common-law restraints on the police power. *See, e.g., Ventenbergs*, 163 Wn.2d at 104 (citing *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 40, 873 P.2d 498 (1994)). If article I, section 12 demanded no more, there would be no reason to confine its scope to laws concerning a "fundamental right of state citizenship." *Grant County* II, 150 Wn.2d at 814.

### A. There Are No Reasonable Economic or Regulatory Grounds for Distinguishing between Religious and Secular Nonprofits

We need not question whether the legislature had reasonable grounds to exempt *all* nonprofit employers from discriminatory employment claims when it enacted WLAD. *See* LAWS OF 1949, ch. 183, § 3. Many nonprofits do socially vital work on a comparative shoestring, most in reliance on erratic government

funds, grants, or donations. *See* Evelyn Brody, *Agents Without Principals: The Economic Convergence of the Nonprofit and For-Profit Organizational Forms*, 40 N.Y.L. SCH. L. REV. 457, 470 & n.50 (1996) (quantifying sources of nonprofit funding). Nonprofits often compete directly with government and for-profit enterprises for scarce resources, including employees, but lack both the for-profit's power to sell ownership interests and the taxing power of a government.

In today's increasingly complex regulatory environment, nonprofits frequently lack access to the sophisticated financial and legal advice enjoyed by for-profit competitors. *See* Carter G. Bishop, *The Deontological Significance of Nonprofit Corporate Governance Standards: A Fiduciary Duty of Care Without a Remedy*, 57 CATH. U. L. REV. 701, 709 (2008). Discrimination suits place a heavy financial and legal burden on these comparatively fragile employers, and the legislature could reasonably exempt nonprofits from WLAD on this basis.

But this is not what the legislature did. The WLAD exempts only religious nonprofits, not secular ones, from employment discrimination claims, and the question is whether its distinction is justified by some "reasonable and just difference" between the two types of employers. *Grant County* I, 145 Wn.2d at 737 (Madsen, J., concurring and dissenting) (citing *McDaniels v. J.J. Connelly Shoe Co.*, 30 Wash. 549, 555, 71 P. 37 (1902)). With respect to the burdens of state regulation, what makes nonprofits vulnerable to discrimination claims is their structure and financing, not their particular mission. Amici Religious Organizations argue that the exemption better enables them to "meet[ ] critical

needs of the most vulnerable," that it "lessens the burden on governmental assistance programs," and that defending discrimination claims requires significant resources that would be better spent for the public good. Br. of Amici Curiae Religious Orgs. at 13-14. Amici are undoubtedly correct, but these arguments apply equally in every respect to secular nonprofits, which are organized for purposes no less socially beneficial, and whose charitable, benevolent, educational, cultural, and scientific aims are no less impaired by civil claims. *See* RCW 24.03.015.

Nor are secular nonprofits any better situated than religious ones to "price these increased expenses [from discrimination suits] into the cost of the 'goods' they provide." Br. of Amici Curiae Religious Orgs. at 15-16. Indeed, religious nonprofits receive the lion's share of private contributions and more volunteer labor than any other nonprofit segment. *See* Brody, *supra,* at 470 n.50 (noting more than 50 percent of all private contributions go to religious employers, and that 75 percent of their labor is donated). Religious and secular nonprofits are similarly situated with regard to civil liability for employment discrimination claims and should be treated the same under the law. Instead, the exemption bestows upon religious nonprofits a uniquely valuable asset. Amici point out that Franciscan Health Services (FHS) and others use the exemption as a bargaining chip in negotiations with unionized employees, offering to waive the exemption as to represented employees. *See* Br. of Amici Curiae Am. Civil Liberties Union, Am. Civil Liberties Union of Wash., and Anti-Defamation League at 11-12.

If there is reasonable ground for the WLAD exemption, it is not based in any economic or regulatory distinction between religious and secular nonprofits. The lead opinion subtly recognizes this fact, as its only argument for granting special privileges to religious nonprofits is based on their religious character. As discussed below, this argument, rather than justifying the WLAD exemption, actually confirms its unconstitutionality.

### B. The Federal Constitution Prohibits Granting Special Benefits to Religious Employers That Are Unrelated to Religious Freedom

Although WLAD's grant of immunity to religious nonprofits lacks any legitimate regulatory basis, the lead opinion asserts it is reasonable because the law alleviates a burden on these employers' religious free exercise. Lead opinion at 18-20. At the same time, the lead opinion is careful to point out that the free exercise clause does not require granting the immunity. *Id.* at 21 n.11. The lead opinion misapprehends the import of its argument: the law violates the First Amendment to the federal constitution. It is therefore per se unreasonable under article I, section 12.

The free exercise and establishment clauses of the First Amendment stand in some tension. While the free exercise clause bars the State from showing overt hostility to religion, the establishment clause addresses the opposite concern, directing that government "may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9, 109 S. Ct. 890, 103 L. Ed. 2d 1

(1989). It prohibits government "from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such." *Gillette v. United States*, 401 U.S. 437, 450, 91 S. Ct. 828, 28 L. Ed. 2d 168 (1971); *see Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703, 114 S. Ct. 2481, 129 L. Ed. 2d 546 (1994) ("government should not prefer one religion to another, or religion to irreligion.").

Laws that benefit religion over nonreligion are valid only if they serve a "secular legislative purpose." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971). Because government must honor the free exercise of religion no less than abstain from promoting it, "the government may (and sometimes must) accommodate religious practices and . . . may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45, 107 S. Ct. 1046, 94 L. Ed. 2d 190 (1987).

But while government can relieve a significant and concrete burden on free exercise, at some point, accommodation of religious freedom crosses the line into "an unlawful fostering of religion." *Id.* at 145. A law that grants a special privilege to religious organizations is unconstitutional if it "is not required by the Free Exercise Clause and . . . either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion." *Bullock*, 489 U.S. at 15 (citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 348, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987) (O'Connor, J., concurring in judgment)).

While the lead opinion purports to follow federal law, it concedes that even the "[a]bsolute freedom of conscience" guaranteed by article I, section 12 does not demand an exemption for religious employers from the WLAD.[4] Lead opinion at 21 n.11. Consequently, the WLAD exemption violates the First Amendment establishment clause unless it removes a "significant state-imposed deterrent" to free exercise. *Bullock*, 489 U.S. at 15.

The lead opinion insists that it does, citing the United States Supreme Court's decision in *Amos*. Lead opinion at 19-20. In its rush to adopt *Amos*, the lead opinion fails to consider that the WLAD exemption is not the equivalent of Title VII of the Civil Right Act of 1964 (Title VII), 42 U.S.C. § 2000e.

Title VII exempts religious employers from federal discrimination law only "'with respect to the employment of individuals *of a particular religion*.'" *Amos*, 483 U.S. at 329 n.1 (emphasis added) (quoting 42 U.S.C. § 2000e-1). Additionally, an employer may give employment preference to members of its own religion only if the employer's "purpose and character are primarily religious." *Equal Emp't Opportunity Comm'n v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988). The Title VII exemption does not cover private secular

---

[4] There is no room for disagreement on this question. The free exercise clause exempts religious employers from employment laws of general applicability only with regard to the hiring and firing of ministers. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n*, 565 U.S. ___, 132 S. Ct. 694, 705-06, 181 L. Ed. 2d 650 (2012). Ockletree staffed a desk in the emergency department at a hospital, where he checked visitors' identification and issued name tags. He was not a "minister" and his dismissal is not protected by any guarantee of religious expression. Nor is there any argument that an individual's "[a]bsolute freedom of conscience" guaranteed by Washington's article I, section 11 protects the defendant corporations. CONST. art. I, § 11.

employers that are merely organized under the auspices of a religious order. *Id.* at 619.

By contrast, the sweeping WLAD exemption allows any religious employer, whether operating a church or a coffee shop, to discriminate against employees on the basis of race, age, sex, or disability status, even if these factors are unrelated in any way to the employer's faith. *See* RCW 49.60.040(11). The WLAD and Title VII exemptions are not comparable, and *Amos* does not resolve the constitutionality of our law. Although the lead opinion asserts that other courts have upheld exemptions as expansive as WLAD's, the only case it cites is inapposite. Lead opinion at 20 (citing *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 997 (C.D. Cal. 2000)).[5] I am unable to find any case that supports the lead opinion's claim.

*Amos'* rationale also fails to translate to the WLAD exemption. The United States Supreme Court noted with approval that Congress' 1972 expansion of the Title VII exemption to nonreligious activities of religious employers relieves them of the peril of predicting "on pain of substantial liability . . . which of its activities a secular court will consider religious." *Amos*, 483 U.S. at 336. The lead opinion gladly builds upon this reasoning, asserting that the legislature can also relieve

---

[5] The California statute pointedly does *not* exempt "a religious corporation or association with respect to persons employed by the religious association or corporation to perform duties, other than religious duties, at a health care facility operated by the religious association or corporation for the provision of health care." CAL. GOV. CODE § 12926.2(c). Other sections narrow the exemption further, echoing the ministerial exemption. *See* CAL. GOV. CODE § 12926.2(b), (d)-(f). Notwithstanding the lead opinion's claim, California's exemption is far narrower than ours and would not cover Ockletree's employment with FHS.

Washington religious employers of the burden of predicting when their beliefs justify taking a discriminatory employment action. Lead opinion at 21. But requiring religious employers to comply with general laws forbidding discrimination on the basis of race and disability does not require them to draw impossible lines in the gray area between religious and secular activities. *Amos*, 483 U.S. at 336 (noting the absence of a bright line for this distinction). It simply requires them not to discriminate. If there is a brighter bright-line rule, I cannot imagine it.

The State may grant special benefits to religious affiliated corporations without violating the establishment clause, but only when necessary to alleviate a burden on free expression that is substantial and concrete. *Bullock*, 489 U.S. at 18; *Amos*, 483 U.S. at 335. Requiring a religious employer to articulate a sincerely held religious belief that concerns one of Washington's "growing list of protected categories," lead opinion at 20, does not itself interfere "with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. WLAD already requires religious organizations not to discriminate against anyone in this "growing list" in places of public accommodation. *See* RCW 49.60.215. So long as civil liability is predicated on secular conduct, such as discrimination on nonreligious grounds, inquiring into the hiring and firing decisions of religious organizations does not entangle church and state or impair the free exercise of religion. *See C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 727-28, 985 P.2d 262 (1999).

As applied to Ockletree, the WLAD exemption immunizes FHS from potential liability for employment discrimination based on grounds unrelated to its religious beliefs or practice. The exemption is not necessary to satisfy FHS's free exercise right and does not alleviate a substantial state-imposed burden on religious freedom. *Bullock*, 489 U.S. at 18 n.8. Consequently, it exceeds the limits of an accommodation of religion and violates the federal establishment clause. Because it is unconstitutional under the First Amendment, the distinction WLAD draws between religious and secular nonprofit employers cannot be "natural, reasonable, or just" under article I, section 12. *Bacich*, 187 Wash. at 84. I would hold it is invalid as applied to Ockletree and all similarly situated plaintiffs. [6]

## CONCLUSION

WLAD grants religious nonprofits immunity from a right of action that belongs to all Washington citizens by virtue of citizenship. Under the privileges and immunities clause, the legislature cannot grant such immunity to one class of corporations unless there are reasonable grounds for excluding others. Because WLAD grants immunity from discrimination claims that are unrelated to the employer's religious beliefs, it is not necessary to alleviate a concrete and

---

[6] A remaining question is whether WLAD stands if the religious exemption is unconstitutional. *See State v. Anderson*, 81 Wn.2d 234, 236, 501 P.2d 184 (1972). The legislature included a severability clause when it amended the definition of "employer" to its present form. LAWS OF 1957, ch. 37, § 27. There is nothing to suggest that the legislature would have preferred to deprive all Washington workers of protection from employment discrimination rather than exempt religious nonprofits, and protecting employees of religious employers from discrimination is consistent with the purpose of the law. *See* RCW 49.60.010. I would hold only that portion of RCW 49.60.040(11) granting a privilege to religious nonprofits invalid, and only as applied to plaintiffs whose dismissal was unrelated to their employers' religious beliefs or practices.

substantial burden on religious exercise. The distinction WLAD draws between religious and secular nonprofits violates the federal First Amendment establishment clause and therefore cannot satisfy the "reasonable ground" standard under article I, section 12. For this reason, I would answer yes to certified question number 2 and hold that RCW 49.60.040(11) cannot be applied to bar WLAD claims alleging race or disability discrimination. I respectfully dissent.

Stephens, J.

González, J.

Fairhurst, J.

Gordon McCloud, J.

No. 88218-5

WIGGINS, J. (concurring in part in dissent)—I concur in part in the result reached by the dissenting opinion.

I agree with the lead opinion's conclusion that Washington's Law Against Discrimination's (WLAD)[1] definition of "employer" is not facially unconstitutional, answering "no" to the first certified question. However, WLAD's exclusion of religious nonprofit organizations from the definition of "employer," under RCW 49.60.040(11), is unconstitutional as applied to Larry Ockletree.

As presented to us, the second certified question is:

> If not [facially unconstitutional], is Wash. Rev. Code § 49.60.040(11)'s exemption unconstitutional as applied to an employee claiming that the religious non-profit organization discriminated against him for reasons wholly unrelated to any religious purpose, practice, or activity?

Order Certifying Question to the Wash. Supreme Ct. (Certification) at 4.

I believe the proper inquiry should be:

> If not [facially unconstitutional], is Wash. Rev. Code section 49.60.040(11)'s exemption unconstitutional as applied to an employee of a religious non-profit organization whose job description and responsibilities are wholly unrelated to any religious practice or activity?

---

[1] Ch. 49.60 RCW.

The original second certified question improperly focused on whether the employer discriminated on religious grounds, which requires courts to engage in excessive entanglement with religious doctrines and practices. Washington courts would be asked to determine what constitutes a particular religion's purpose, practice, and activity and determine whether the reason for the discrimination is related. This is an intrusive inquiry into religious doctrine.

Instead, I believe the constitutionality of the exemption depends entirely on whether the employee's job responsibilities relate to the organization's religious practices. In other words, RCW 49.60.040(11) is constitutionally applied in cases in which the job description and responsibilities include duties that are religious or sectarian in nature. This test permits an objective examination of an employee's job description and responsibilities in the organization.

Regarding the first certified question, I would answer that the statute is not facially unconstitutional. I agree with the dissent that the exemption of religious and sectarian organizations in RCW 49.60.040(11) is subject to scrutiny under the privileges and immunities clause of article I, section 12 of the Washington Constitution. But I depart from the dissent because I agree in part with the lead opinion's conclusion that there is a reasonable ground for the exemption for religious and sectarian organizations. Lead opinion at 18-21. As the lead opinion explains, it was reasonable for the legislature to exempt religious nonprofit organizations from the definition of "employer" in order to promote two goals: avoiding excessive entanglement with religious doctrines and practices and facilitating the free exercise of religion guaranteed by our Washington Constitution.

2

But the exemption is reasonable only to the extent that it relates to employees whose job responsibilities relate to the organization's religious practices. When the exemption is applied to a person whose job qualifications and responsibilities are unrelated to religion, there is no reasonable ground for distinguishing between a religious organization and a purely secular organization. Therefore, I agree with the dissent that the exemption is invalid when applied to an employee like Ockletree, assuming that there is no relationship between his duties and religion or religious practices.

For these reasons, I would answer the first certified question no and the second revised certified question yes.

_Wiggins, J._